# EXHIBIT A

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                         FOURTH JUDICIAL DISTRICT

---

David A. Badhwa and Denise A. Badhwa,                Case Type:  Other Contracts
                                                     Court File No.:  27-cv-18-1218
                    Plaintiffs,                      Judge:  Daniel C. Moreno

        v.                                           **AMENDED COMPLAINT**

Veritec, Inc.,

                    Defendant.

---

        Plaintiffs David A. Badhwa and Denise A. Badhwa (the "Badhwas") for their Amended

Complaint against Defendant Veritec, Inc. ("Veritec"), state and allege as follows:

## PARTIES

        1.      The Badhwas are individual residents of Minnesota.

        2.      Upon information and belief, Veritec is a Nevada corporation with its principle

place of business in Golden Valley, Minnesota.  Veritec produces secure verification technology

used in connection with financial products and transactions.

## BACKGROUND

        3.      The Badhwas loaned $100,000.00 to Veritec pursuant to a promissory note dated

May 15, 2009 ("Note").  A copy of the Note is attached herein as Exhibit A.

        4.      Under the Note, Veritec promised to repay $100,000.00 to the Badhwas, plus

annual interest of 8 percent.

        5.      Veritec made a payment of $10,000.00 in partial satisfaction of the note by a

check dated July 2, 2013 ("Check").  A copy of the Check, with sensitive financial information

redacted, is attached herein as Exhibit B.

EXHIBIT A

6.     Veritec's indebtedness to the Badhwas on the Note, including outstanding principal and the interest accrued thereon, is at least $162,990 as of May 15, 2018.

7.     The Note provides that in certain "Events of Default," the Badhwas may demand the immediate and full principal amount of the Note together with accrued interest thereon.  As relevant here, such events include Veritec's failure to pay the principal or interest on the Note when it becomes due.  In addition, a failure by Veritec to satisfy a material obligation under the Note also constitutes a default.

8.     In the Note, Veritec waived protest, presentment, and all notices and demands in connection with the delivery, acceptance, performance, default, or endorsement of the Note.

9.     The Note provides that Veritec will reimburse the Badhwas for the costs of collection, including attorneys' fees, the Badhwas incur if they commence an action to enforce the Note.

10.     In the Note, Veritec also agreed to submit to the jurisdiction of the State and Federal Courts in Minnesota and agreed that "any judicial action to enforce any right of any party under this Note may be brought and maintained in Minnesota state . . . courts located in Hennepin County."

## JURISDICTION AND VENUE

11.     Veritec is subject to personal jurisdiction in Minnesota because its principal place of business is in Golden Valley, Minnesota.

12.     Venue is proper in this District pursuant to Minn. Stat. § 542.09 because Veritec has its principal place of business in Hennepin County, the cause of action arose in significant part in Hennepin County, and the parties agreed in the Note to venue of judicial actions in the courts of Hennepin County.

2

EXHIBIT A

## COUNT I

### (BREACH OF THE NOTE)

13.     The Badhwas restate and reallege all previous paragraphs of this Complaint.

14.     The Note is a valid and binding obligation of Veritec.

15.     Veritec failed to make payments that are due under the Note.

16.     The Badhwas demanded full payment of all outstanding indebtedness under the Note.

17.     Veritec has failed to pay all outstanding indebtedness under the Note.

18.     Veritec's failure to pay all outstanding indebtedness is a breach of its obligations under the Note.

19.     The Badhwas have suffered damages as a result of Veritec's breach of its obligations under the Note.

## COUNT II

### (UNJUST ENRICHMENT)

20.     The Badhwas restate and reallege all previous paragraphs of this Complaint.

21.     The Badhwas conferred a benefit on Veritec.

22.     Veritec had knowledge of the benefit conferred by the Badhwas.

23.     Veritec has retained the benefit under circumstances where it would be unjust for Veritec to retain the benefit.

24.     To avoid unjust enrichment, Veritec should be required to return all amounts owed under the Note to the Badhwas.

WHEREFORE, the Badhwas request judgment as follows:

1.     For damages relating to Veritec's breach of the Note and unjust enrichment in an amount in excess of $50,000.00 to be determined at trial.

3

EXHIBIT A

2.      Awarding the Badhwas prejudgment interest, their attorneys' fees, costs and disbursements incurred herein, including as provided by the Note.

3.      Granting the Badhwas such other and further relief as the Court deems just and equitable.


Dated:  June 18, 2018                              /s/ Joseph J. Cassioppi
                                                   Joseph J. Cassioppi  (#0388238)
                                                   Jacob P. Harris (#399255)
                                                   **FREDRIKSON & BYRON, P.A.**
                                                   200 South Sixth Street, Suite 4000
                                                   Minneapolis, MN  55402-1425
                                                   Telephone:  612.492.7000
                                                   jcassioppi@fredlaw.com
                                                   jharris@fredlaw.com

                                                   ***Attorneys for Plaintiffs***

EXHIBIT A

## ACKNOWLEDGMENT

Plaintiffs, through undersigned counsel, acknowledge that sanctions may be imposed pursuant to Minn. Stat. § 549.211.

Dated:  June 18, 2018

/s/ Joseph J. Cassioppi
Joseph J. Cassioppi (#0388238)
Jacob P. Harris (#0399255)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
Telephone:  (612) 492-7000
Facsimile:  (612) 492-7077
jcassioppi@fredlaw.com
jharris@fredlaw.com

*Attorneys for Plaintiffs*

64209793

5

EXHIBIT A

# EXHIBIT A

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE, IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933 OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF SUCH ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, ALL AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY.

## UNSECURED TERM PROMISSORY NOTE

**$100,000.00**                                        **Dated: May 15, 2009**

FOR VALUE RECEIVED, Veritec, Inc., a Nevada corporation (the "Maker" or "Company"), with its primary offices located at 2445 Winnetka Ave. N., Golden Valley, MN 55427 U.S.A., promises to pay to the order of **Dave Anthony Badhwa and Denise Anita Badhwa** or its registered assigns (the "Payee"), upon the terms set forth below, the principal sum of **ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00)**, with interest on the principal sum at the rate of eight percent (8%) per annum. THIS UNSECURED TERM PROMISSORY NOTE (this "Note") is not secured by any security interest in any of the Company's assets and the Company shall have no obligation to provide Payee with any collateral to secure repayment of the loan evidenced by this Note. This Note is the Note referred to in the Subscription Agreement and Letter of Investment Intent by and between the Company and Payee, dated as of the date hereof.

1.    Payments.

(a)    The full amount of principal and accrued interest under this Note shall be due on the eighteen-month anniversary of the date of this Note, as first set forth above (the "Maturity Date"), unless converted earlier in accordance with the express terms of this Note.

(b)    Maker may prepay the principal sum and interest under this Note in whole or in part until the Maturity Date or such earlier time as the principal sum and interest become due in accordance with the terms of this Note.

(c)    Any payments of principal under and pursuant to this Note shall be made in cash, by either check or wire transfer of immediately available funds to the Payee pursuant to written instructions from the Payee.

2.    Events of Default.

(a)    An "Event of Default," wherever used herein, means any one of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

1

EXHIBIT A

(i)     any default in the Maker's obligation to make payment of the principal or interest under this Note, as and when the same shall become due and payable;

(ii)    where Maker fails to observe or perform any material obligation or breaches any material term or provision of this Note and such failure or breach shall not have been remedied within ten (10) days after the date on which notice of such failure or breach shall have been delivered by Payee to Maker;

(iii)   a Change in Control (defined herein) of the Company; or

(iv)    where Maker commences, or there shall be commenced against Maker, a case under any applicable bankruptcy or insolvency laws as now or hereafter in effect or any successor thereto, or Maker commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to Maker, or there is commenced against Maker any such bankruptcy, insolvency or other proceeding which remains un-dismissed for a period of sixty (60) days from the date of commencement of such proceeding; or Maker is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or Maker suffers any appointment of any custodian or the like for it in any substantial part of its property which continues un-discharged or un-stayed for a period of sixty (60) days; or Maker makes a general assignment for the benefit of creditors; or Maker shall fail to pay, or shall state in writing that it is unable to pay its debts generally as they become due.

(b)     For purposes of the foregoing, a **"Change in Control"** shall mean the occurrence after the date hereof of any of (i) an acquisition by one or more investors of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of more than 33% of the voting securities of the Company, or (ii) the Company's merger into or consolidation with any other firm or entity or association, or the merger or consolidation of any other firm, entity or association into or with the Company and, after giving effect to such transaction, the shareholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the Company or the successor entity of such transaction, or (iii) the Company sells or transfers all or substantially all of its assets to another firm, entity or association and the shareholders of the Company immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, or (iv) a replacement at one time or within a three-year period of more than one-half of the members of the Company's board of directors which is not approved by a majority of those individuals who are members of the board of directors on the date hereof (or by those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the date hereof), or (v) the execution by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth in clauses (i) through (iv) above. Notwithstanding anything to the contrary contained herein, the acquisition by Van Thuy Tran, Larry Johanns, The Matthews Group, or any of their respective successors in interest, nominees, trustees, executors, other person or entity in a representative capacity, of any additional equity securities of the Company, shall not be considered a Change in Control.

(c)     If any Event of Default occurs, then the full principal amount of this Note, together with all accrued interest thereon, shall at the Payee's election become immediately due and payable in the manner described in Section 1 of this Note, above. The Payee need not provide and Maker

2

hereby waives any presentment, demand, protest or other notice of any kind, and the Payee may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such declaration may be rescinded and annulled by Payee at any time prior to payment hereunder. No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

3.   Conversion.

(a)   At the election of the Payee on or before the Maturity Date, the entire principal and accrued but unpaid interest under this Note (the "**Note Amount**") shall be converted and be applied as provided in this Section 3.

(b)   Any conversion of the Note Amount shall convert into purchase price payable for the convertible promissory notes, warrants or other securities of the Company (the "**Securities**"), contemplated to be sold in connection with an anticipated financing transaction (the "**Proposed Transaction**"). As soon as is practicable prior to the closing of a Proposed Transaction, the Company will notify Payee of such Proposed Transaction (the "**Conversion Notice**"). Payee will have five (5) days after receipt of the Conversion Notice to notify the Company in writing that it intends to convert this Note into Securities as part of the Proposed Transaction. Upon any conversion pursuant to this Section 3, the Payee will promptly upon the Company's request (and in any event within ten (10) business days) surrender this Note for cancellation on the Company's books and records or, in cases where the Note has been lost or misplaced, a duly executed affidavit of loss with respect to the Note, in form and substance reasonably satisfactory to the Company. Upon conversion, and regardless of whether this Note has at that time been surrendered, the Company shall be entitled to cancel this Note on its books and records. Payee will promptly execute such agreements and other documents as the other investors in the Proposed Offering under which the Note will be converted are required to execute in form and substance reasonably satisfactory to the Company.

4.   No Waiver of Payee's Rights. All payments of principal and interest shall be made without setoff, deduction or counterclaim. No delay or failure on the part of the Payee in exercising any of its options, powers or rights, nor any partial or single exercise of its options, powers or rights shall constitute a waiver thereof or of any other option, power or right, and no waiver on the part of the Payee of any of its options, powers or rights shall constitute a waiver of any other option, power or right. Maker hereby waives presentment of payment, protest, and all notices or demands in connection with the delivery, acceptance, performance, default or endorsement of this Note. Acceptance by the Payee of less than the full amount due and payable hereunder shall in no way limit the right of the Payee to require full payment of all sums due and payable hereunder in accordance with the terms hereof.

5.   Modifications. No term or provision contained herein may be modified, amended or waived except by written agreement or consent signed by the party to be bound thereby.

6.   Cumulative Rights and Remedies. The rights and remedies of Payee expressed herein are cumulative and not exclusive of any rights and remedies otherwise available under this Note, or applicable law (including at equity). The election of Payee to avail itself of any one or more remedies shall not be a bar to any other available remedies, which Maker agrees Payee may take from time to time.

3

EXHIBIT A

7.  Collection Expenses.  If Payee shall commence an action or proceeding to enforce this Note, then Maker shall reimburse Payee for its costs of collection and reasonable attorneys' fees incurred with the investigation, preparation and prosecution of such action or proceeding.

8.  Severability.  If any provision of this Note is declared by a court of competent jurisdiction to be in any way invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.

9.  Successors and Assigns.  This Note shall be binding upon Maker and its successors and shall inure to the benefit of the Payee and its successors and assigns.  The term "Payee" as used herein, shall also include any endorsee, assignee or other holder of this Note.

10.  Lost or Stolen Note.  If this Note is lost, stolen, mutilated or otherwise destroyed, Maker shall execute and deliver to the Payee a new promissory note containing the same terms, and in the same form, as this Note.  In such event, Maker may require the Payee to deliver to Maker an affidavit of lost instrument and customary indemnity in respect thereof as a condition to the delivery of any such new promissory note.

11.  Governing Law; Dispute Resolution.  This Note shall be governed by the laws of the State of Minnesota without regard to its conflicts-of-law principles.  Any judicial action to enforce any right of any party under this Note may be brought and maintained in Minnesota state or federal courts located in Hennepin County.  Accordingly, the parties hereby submit to the process, jurisdiction and venue of any such court.  Each party hereby waives, and agrees not to assert, any claim that it is not personally subject to the jurisdiction of the foregoing courts in the State of Minnesota or that any action or other proceeding brought in compliance with this Section is brought in an inconvenient forum.

13.  Notice.  Any and all notices or other communications or deliveries to be provided by the Payee hereunder shall be in writing and delivered to the Company at the address of its principal place or business, or to the Payee at the following address:  3084 Rodeo Drive NE, Blaine, MN 55449.

IN WITNESS WHEREOF, the undersigned signs this Note as and on behalf of the "Maker" and not as a surety or guarantor or in any other capacity.

VERITEC, INC., a Nevada corporation

By _____
Name: _____
Title: _____

4

# EXHIBIT B

REVERSE AUTHENTICITY SEAL. REVERSE SIDE INCLUDES COLOR PRISM AND MICROPRINT "REVERSE SIDE"

**VERITEC INC**
2445 WINNETKA AVE N
GOLDEN VALLEY, MN 55427

WELLS FARGO BANK, N.A.

**9218**

17-1/910

7/2/2013

PAY TO THE
ORDER OF     Dave Badhwa

$ **10,000.00

Ten Thousand and 00/100************************************************************************ **DOLLARS**

Dave Badhwa
JAB Companies, Inc.
1701 E Hennepin Ave
Suite 150
Minneapolis, MN 55414
MEMO:  Repay principal on Note

*Van Huy Tran*

AUTHORIZED SIGNATURE

⑈009218⑈ ⑆091000019⑆ ▮▮▮▮0508⑈

---

**VERITEC INC**
Dave Badhwa

7/2/2013

**9218**
10,000.00

Wells Fargo Checking   Repay principal on Note

10,000.00

EXHIBIT A

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
Case Type: Other Contracts

| | |
|---|---|
| **David A. Badhwa and Denise A. Badhwa,**<br><br>        **Plaintiffs,**<br><br>v.<br><br>**Veritec, Inc.,**<br><br>        **Defendant,**<br><br>**and**<br><br>**Veritec, Inc.,**<br><br>        **Counter-Plaintiff and Third-Party Plaintiff,**<br><br>v.<br><br>**David A. Badhwa and Denise A. Badhwa,**<br><br>        **Counter-Defendants,**<br><br>**and**<br><br>**JAB Companies, Inc.,** a Minnesota Corporation; **Acesse Corporation**, a Nevada Corporation; **ADXNET, Inc.,** a Nevada Corporation; **ADX Labs L.L.C.**, a Minnesota limited liability company; **A2Z Holdings, Inc.**, a Delaware corporation; **MobileSoft Technology, Inc.**, a Delaware Corporation; **Mobile.net LLC**, a Delaware limited liability company; **Steven Renner**, an individual; and **Joseph Morris**, an individual,<br><br>        **Third Party Defendants.** | Court File No.: 27-cv-18-1218<br>Hon. Daniel C. Moreno<br><br><br><br><br><br>**DEFENDANT VERITEC, INC.'S VERIFIED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT** |

1

EXHIBIT A

Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

Defendant Veritec, Inc. ("Veritec"), by and through its counsel, for its answer to the Amended Complaint (hereinafter "Complaint") filed by Plaintiffs David A. Badhwa and Denise A. Badhwa, denies each allegation in the Complaint unless expressly admitted or otherwise qualified, as follows:

## PARTIES

1.      On information and belief, Veritec admits the allegations set forth in Paragraph 1.

2.      Veritec admits the allegations set forth in Paragraph 2.

## BACKGROUND

3.      Veritec denies the allegations set forth in Paragraph 3.

4.      Paragraph 4 of the Complaint purports to describe what Plaintiffs are characterizing as the "Note," which speaks for itself. To the extent that Paragraph 4 is inconsistent with the terms of the "Note," it is denied.

5.      Veritec admits only that it made a payment of $10,000 by check dated July 2, 2013. Veritec denies that the check was made in partial satisfaction of what Plaintiffs are characterizing as the "Note."

6.      Veritec denies the allegations set forth in Paragraph 6.

7.      Paragraph 7 of the Complaint purports to describe and quote an incomplete excerpt of what Plaintiffs are characterizing as the "Note," which speaks for itself. To the extent that Paragraph 7 is inconsistent with the terms of the "Note," it is denied.

8.      Paragraph 8 of the Complaint purports to describe an incomplete excerpt what Plaintiffs are characterizing as the "Note," which speaks for itself. To the extent that Paragraph 8 is inconsistent with the terms of the "Note," it is denied.

EXHIBIT A

9.     Paragraph 9 of the Complaint purports to describe what Plaintiffs are characterizing as the "Note," which speaks for itself. To the extent that Paragraph 9 is inconsistent with the terms of the "Note," it is denied. Veritec affirmatively denies that Plaintiffs are entitled to any damages or costs of collection, including attorneys' fees, in this action.

10.     Paragraph 10 of the Complaint purports to describe and quote an incomplete excerpt what Plaintiffs are characterizing as the "Note," which speaks for itself. To the extent that Paragraph 10 is inconsistent with the terms of the "Note," it is denied.

**JURISDICTION AND VENUE**

11.     Veritec admits that jurisdiction is proper in this Court.

12.     Veritec admits only that venue is proper in this Court.

**COUNT I**

(Breach of the Note)

13.     Veritec restates and incorporates by reference all of its answers to the preceding paragraphs as if set forth fully herein.

14.     Veritec states that Paragraph 14 constitutes a legal conclusion to which no response is required. To the extent a response is required, it is denied.

15.     Veritec denies the allegations set forth in Paragraph 15.

16.     Veritec admits that Plaintiffs demanded payment; Veritec denies that there remains any outstanding indebtedness.

17.     Veritec denies the allegations set forth in Paragraph 17.

18.     Veritec denies the allegations set forth in Paragraph 18.

3

EXHIBIT A

19.    Veritec denies the allegations set forth in Paragraph 19.

## COUNT II

### (Unjust Enrichment)

20.    Veritec restates and incorporates by reference all of its answers to the preceding paragraphs as if set forth fully herein.

21.    Veritec denies the allegations set forth in Paragraph 21.

22.    Veritec denies the allegations set forth in Paragraph 22.

23.    Veritec denies the allegations set forth in Paragraph 23.

24.    Veritec denies the allegations set forth in Paragraph 24.

## AFFIRMATIVE DEFENSES

1.    The Complaint fails to state a claim upon which relief may be granted.

2.    Plaintiffs' claims are barred by the statute of limitations.

3.    Plaintiffs' claims are barred, in whole or in part, to the extent that they failed to mitigate their damages or take other reasonable steps to reduce their damages.

4.    Plaintiffs' claims are barred by their own failure to comply with, and breach of, the terms of the purported Agreements from which its claims arise.

5.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, laches, and/or estoppel.

6.    Plaintiffs' claims are barred in whole or in part due to its own unclean hands.

7.    To the extent that the Note is enforceable, and that Veritec breached that Note (it did not), such breach was justified.

EXHIBIT A

27-CV-18-1218

CASE 0:18-cv-02258-PJS-DTS   Document 1-1   Filed 08/01/18   Page 18 of 54   Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

8.      Any alleged breach by Veritec of any agreement was legally excused by, among other reasons, Plaintiffs' prior breach, termination or repudiation of any such agreement.

9.      Plaintiffs' claims are barred by the applicable statute of limitations.

10.     Veritec's performance of any contractual obligation to Plaintiffs, including under the asserted Note, is excused by David Badhwa's fraudulent inducement to enter into any such contractual commitments.

11.     Veritec reserves the right to assert any additional affirmative defense available under applicable law as may be discovered during the course of additional investigation and discovery.


## DEFENDANT VERITEC, INC.'s VERIFIED COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Pursuant to Minn. R. Civ. P. 13.01, 13.02, and 14.01, Defendant/Counter-Plaintiff Veritec, Inc. ("Veritec") hereby brings the following counterclaims and third party claims for breach of contract, breach of fiduciary duty, usurpation of business opportunity, tortious interference with contract, tortious interference with business opportunity, business defamation, misappropriation of trade secrets and confidential information, civil theft, aiding and abetting, conspiracy, and unjust enrichment against Plaintiff/Counter-Defendants David and Denise Badhwa and Third Party Defendants JAB Companies, Inc. ("JAB"), Acesse Corporation ("Acesse"), ADXNET, Inc. ("ADXNET"), ADX Labs L.L.C. ("ADX"), A2Z Holdings, Inc. ("A2Z"), Steven Renner, and Joseph Morris (collectively, "Defendants"), and in support thereof states as follows:

5

EXHIBIT A

Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

## PARTIES

1.      Counter-Plaintiff Veritec, Inc. is a Nevada corporation which offers a complete line of secure verification and financial payment systems, along with the technology to use its payment systems with mobile phones or debit cards. Veritec trades on the OTC markets using the symbol "VRTC." Veritec is headquartered at 2445 Winnetka Ave. N., Ste. 201, Golden Valley, MN 55427.

2.      Veritec is a market leader in the development of mobile payment solutions, including the "blinxPay™" mobile application, the "blinxPhone™" mobile payment device, and related solutions.

3.      Veritec has also developed secure verification technologies for driver's licenses and other identification documents and created a method to combine its payment technology and verification technologies into a single card.

4.      On information and belief, Counter-Defendant David A. Badhwa resides at 3084 Northeast Rodeo Drive, Blaine, MN, in Anoka County.

5.      On information and belief, Mr. Badhwa is the President of JAB Companies, and acted as an agent and principal of JAB at all times relevant to Veritec's allegations herein.

6.      On information and belief, Counter-Defendant Denise A. Badhwa resides at 3084 Northeast Rodeo Drive, Blaine, MN, in Anoka County. Ms. Badhwa is the registered Chief Executive Officer of JAB and was an agent and principal of JAB at all times relevant to Veritec's allegations herein.

7.      Third Party Defendant JAB Companies is a Minnesota corporation with its registered address at 455 37th Avenue NE, Ste. B, Columbia Heights, MN, in Hennepin County.

EXHIBIT A

Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

8.     JAB's website indicates that it "is a consulting, distribution and business development firm." The website further states that it offers services in the "Mobile Pay" sector, and lists Veritec's "BLINXPAY" as one of the mobile payment services it offers.

9.     On information and belief, JAB was founded and incorporated by Counter-Defendants David and Denise Badhwa.

10.    On information and belief, JAB is a mere alter ego of the Badhwas, as the Badhwas used JAB as a mere façade for their individual dealings, including Mr. Badhwa's dealings with Veritec.

11.    Third Party Defendant Acesse Corporation is a Nevada Corporation registered to do business in Minnesota pursuant to Chapter 303 of the Minnesota Statutes. Acesse's registered office address is 250 2nd Ave S, Ste. 145, Minneapolis, MN, in Hennepin County.

12.    Acesse was founded as Inter-Mark Corporation by Steven Renner.

13.    In 2012, Inter-Mark re-branded as Acesse.

14.    According to the Minneapolis Star Tribune and the Pioneer Press, the offices of Inter-Mark Corporation was raided related to an alleged internet Ponzi scheme in 2010; the investigation saw the return of $16 to $18 million to Inter-Mark's members.

15.    On information and belief, Steven Renner is the Chief Executive Officer and sole or majority owner of Acesse.

16.    Third Party Defendant ADXNET, Inc. is a Nevada Corporation registered to do business in Minnesota pursuant to Chapter 303 of the Minnesota Statutes. ADXNET's registered address in Minnesota is 100 Washington Ave., S, Ste. 690, Minneapolis, MN, in Hennepin County.

17.    On information and belief, ADXNET is a wholly-owned subsidiary of Acesse.

EXHIBIT A

18.    According to its website, ADXNET provides "software and services for the affiliate industry."

19.    According to Nevada corporation records, Steve Renner is the President, Secretary, Treasurer, and Director of ADXNET.

20.    Third Party Defendant ADX Labs, L.L.C. is a Minnesota limited liability company, which has a registered address and principal place of business at 120 South Sixth St., Ste. 1000, Minneapolis, MN, in Hennepin County.

21.    On information and belief, ADX is a wholly-owned subsidiary of Acesse or ADXNET.

22.    On information and belief, ADX operates many of the ventures advertised on Acesse or ADXNET's website, including Gamesmart (which brands itself as a "Service of ADX LABS LLC") and Mobile.net (branded as "a subsidiary of ADX Labs, LLC").

23.    Third Party Defendant A2Z Holdings, Inc. is a Delaware corporation registered to do business in Minnesota pursuant to Chapter 303 of the Minnesota Statutes. A2Z has a registered address of 100 Washington Ave. S, Ste. 690, Minneapolis, MN, in Hennepin County.

24.    On information and belief, A2Z shares office space and personnel with ADXNET, Acesse, ADX, and other companies owned directly or indirectly by Steve Renner.

25.    On information and belief, Renner owns approximately 85-90% of A2Z, with Third Party Defendant Joseph Morris owning the remainder.

26.    Third Party Defendant Joseph Morris is the Chief Executive Officer of A2Z.

27.    On information and belief, A2Z was formed for the express purpose of acquiring a majority stake in Veritec while concealing the involvement of Renner.

8

EXHIBIT A

27-CV-18-1218

CASE 0:18-cv-02258-PJS-DTS   Document 1-1   Filed 08/01/18   Page 22 of 54   Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

28.     Third Party Defendant MobileSoft Technology, Inc. is a Delaware corporation registered to do business in Minnesota pursuant to Chapter 303 of the Minnesota Statutes. MobileSoft has a registered address of 120 South Sixth St., Ste. 900, Minneapolis, MN, in Hennepin County.

29.     On information and belief, MobileSoft shares office space and personnel with other companies owned directly or indirectly by Steve Renner, and is owned and controlled by Steve Renner. In or around April 2016, Renner proposed for MobileSoft to purchase a significant stake in Veritec, though that investment was not consummated.

30.     Third Party Defendant Joseph Morris is the Chief Executive Officer of MobileSoft.

31.     Third Party Defendant Mobile.net is, according to its website, a wholly-owned subsidiary of ADX Labs, LLC.

32.     On information and belief, Mobile.net is either a trade name utilized by ADXNET, Inc. or a separate corporation organized under the laws of Delaware, with its principal place of business at 120 South Sixth St., Ste. 1000, Minneapolis, MN, in Hennepin County.

33.     On information and belief, Mobile.net is wholly owned and controlled, directly or indirectly, by Steve Renner.

34.     Mobile.net's WhoIs domain search listing reflects that its internet domain was registered by ADXNET.

35.     On information and belief, Third Party Defendant Steven "Steve" Renner resides at 12557 Riverview Rd., Eden Prairie, MN, in Hennepin County.

36.     On information and belief, Mr. Renner is the founder, majority owner, and/or officer of Acesse, ADXNET, ADX, A2Z, MobileSoft, and Mobile.net.

9

37.     In 2009, Mr. Renner was sentenced to 18 months in prison after being convicted of four counts of tax evasion; according to the Star Tribune and Pioneer Press, Mr. Renner was accused of operating an internet Ponzi scheme through Inter-Mark Corporation, which is now known as Acesse, and Inter-Mark was forced to return $16-18 million to its members in 2011. Acesse, ADXNET, ADX, A2Z, MobileSoft, and Mobile.net are all owned and controlled by, and are the alter egos of, Mr. Renner.

38.     On information and belief, Third Party Defendant Joseph "Joe" Morris is a resident of Minnesota. Mr. Morris is an executive officer or employee of a number of the companies founded, owned, and/or controlled by Steve Renner. On information and belief, Morris is the CFO of Acesse, the CEO of A2Z, and the CEO of MobileSoft, potentially among other roles.

## JURISDICTION AND VENUE

39.     The Court has personal jurisdiction over Counter-Defendants because they reside in Minnesota and have availed themselves of this Court in pursuit of their own claim against Veritec. The Court has personal jurisdiction over the third-party corporate entities because they are either incorporated under the laws of Minnesota, have their principal place of business in Minnesota, or have registered to do business in Minnesota. The Court has personal jurisdiction over the individual Third Party Defendants.

40.     The Court has subject matter jurisdiction over this matter pursuant to Minn. Stat. § 484.01.

41.     Venue is proper in Hennepin County because the registered addresses of Acesse, JAB, A2Z, ADXNET, ADX, MobileSoft, and Mobile.net are all located in Hennepin County, and

EXHIBIT A

27-CV-18-1218

CASE 0:18-cv-02258-PJS-DTS   Document 1-1   Filed 08/01/18   Page 24 of 54   Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

because a substantial portion of the events giving rise to Veritec's claims took place within Hennepin County.

## VERITEC'S BACKGROUND AND PRODUCT DEVELOPMENT

42.     Veritec was formed in 1982 to develop, manufacture, and offer for sale secure and verifiable technological solutions, including its patented and proprietary barcode technology.

43.     Veritec's products have garnered much success in the market and have won numerous awards, recognitions, and approvals, including NASA's endorsement of Veritec's two-dimensional matrix coding technology.

44.     Veritec offers a complete suite of secure verification software and technology for use in identification, peer-to-peer transactions, and other financial products, services, and transactions. This suite includes the Vericode® and VSCode™ Secure 2D Bar Codes, prepaid and reloadable debit cards (including the blinx On-Off™ Prepaid Debit Card), blinxPay™ Mobile Wallet, the blinxPhone™ mobile device, Bio-ID Cards, among others.

45.     As part of the development of these secure and technologically complex products, Veritec developed or acquired, and now holds, a number of United States patents, including patents 5,612,524 (Identification symbol system and method with orientation mechanism), 7,159,780 (method for reading a symbol having encoded information), 7,484,659 (secure cards and methods), 7,510,125 (multi-dimensional symbologies and related methods), 7,516,905 (methods for encoding and decoding information), 7,614,551 (method and system for securely encoding and decoding biometric data into a memory device using a two dimensional symbol), 8,152,056 (secure cards and methods), and 8,152,070 (two-dimensional symbol and method for reading same). On

EXHIBIT A

information and belief, discovery may reveal that one or more Counter-Defendants or Third Party Defendants are infringing upon Veritec's patent rights.

46.     Veritec utilizes its patents and other intellectual property, including its copyrighted software source code, in its secure payment and verification technology, and Veritec invested heavily in developing the same. On information and belief, discovery may reveal that one or more Counter-Defendants or Third Party Defendants are infringing upon Veritec's copyright in its source code.

47.     In addition to the aforementioned patents and copyrighted source code, Veritec maintains a number of trade secrets, which it uses to produce and market its secure payment and verification products.

## RELATIONSHIP WITH DAVID BADHWA AND JAB COMPANIES

48.     In or about early 2009, Mr. Badhwa approached Veritec's founder, Van Thuy Tran, about licensing several products then under development at Veritec, including Veritec's patented Bio-ID cards.

49.     Mr. Badhwa expressed interesting in marketing and selling Veritec's products in, among other countries, Guyana, Trinidad, Jamaica, and Barbados.

50.     Mr. Badhwa approached Veritec both individually and on behalf of JAB.

51.     Veritec quoted Mr. Badhwa a license price of $200,000 for a two-year exclusive distributorship.

52.     Because the products were still under development, Veritec and Mr. Badhwa agreed to a significant reduction to the license fee, reduced to $100,000, and structured the license fee as a convertible promissory note. The promissory note was executed effective May 15, 2009.

12

EXHIBIT A

Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

53.    Throughout Mr. Badhwa's relationship with Veritec, Veritec and Mr. Badhwa treated himself and JAB interchangeably, with little attention paid to corporate formalities.

54.    Despite the fact that some of Veritec's products were still under development, with the notable exception of its award-winning secure, two-dimensional bar-code technology, Mr. Badhwa expressed interest in continuing to work with Veritec during the development of the products he sought to license.

55.    Mr. Badhwa is and was a software engineer by trade and, as such, Veritec saw the advantages of working with Mr. Badhwa to assist with the development of its products.

56.    As a result, Veritec and JAB/Mr. Badhwa entered into a Confidentiality Agreement effective November 1, 2010.

57.    The purpose of the Confidentiality Agreement was "to enable the parties to explore the possibility of entering into a business or technical alliance."

58.    Under the Confidentiality Agreement, JAB and Mr. Badhwa had certain obligations regarding the uses to which he was permitted to put Veritec's Confidential Information, including, for example, that they were not permitted to disclose Veritec's confidential information except under limited circumstances.

59.    Moreover, JAB and Mr. Badhwa were strictly prohibited from creating derivative works from, or reverse-engineering, decompiling, or disassembling any software code and/or pre-release hardware devices disclosed to them.

60.    Pursuant to the terms of the Confidentiality Agreement and additional oral and implied agreements between the parties, Mr. Badhwa began to work in partnership with Veritec to develop and market Veritec's products, individually and through JAB.

EXHIBIT A

61.     The products on which Mr. Badhwa worked included Veritec's blinxPay mobile application, blinxPhone mobile device, the blinx On-Off Prepaid Debit Card, and Veritec's secure national ID cards.

62.     At the conclusion of the product development process, the source code, designs, copyrights, trademarks, and all other aspects of the of the foregoing products and software was the sole property of Veritec, and any right vested in Mr. Badhwa was granted to Veritec as work-for-hire.

63.     Veritec paid many, or most, of Mr. Badhwa's expenses incurred in developing Veritec's software and other products, along with other substantial payments.

64.     Veritec further paid Mr. Badhwa to develop and create demonstration kits and phones so that Mr. Badhwa could demonstrate Veritec's products.

65.     Development on the blinxPay™ mobile application and the blinxPhone™ mobile device began in earnest in 2013 in China.

66.     As part of the development process for blinxPay™ and blinxPhone™, Veritec provided Mr. Badhwa with significant funds.

67.     Among the funds Veritec paid to Mr. Badhwa related to the development of blinxPay™ and blinxPhone™ was a July 2013 check in the amount of $10,000 from Veritec to Mr. Badhwa.

68.     This check, however, was misrecorded as a payment on the promissory note entered by the parties in 2009 by Veritec's bookkeeper, who had limited English skills, rather than as a payment for expenses incurred in developing Veritec's products. Due to the origin of the promissory note as a substitute for the $100,000 license fee for JAB's ability to distribute Veritec's

14

EXHIBIT A

products in Guyana, Veritec did not make any payments on the promissory note, and Mr. Badhwa

understood and accepted these reasons. Mr. Badhwa waived enforcement of the promissory note.

69.     As part of Mr. Badhwa's work in China, he developed relationships with companies

which would later become part of Veritec's supply chain. One of these relationships was with the

company that produces the blinxPhone. Mr. Badhwa was intimately involved with establishing the

product line and production methods at this Chinese manufacturer's plant.

70.     In 2015, development on the blinxPay and blinxPhone products was complete.

71.     The blinxPay mobile application and blinxPhone mobile device were ready to go

to market no later than July 8, 2016.

72.     While the Confidentiality Agreement had an initial term of two years, the parties

waived that term and/or impliedly extended the Confidentiality Agreement by their conduct,

including by Veritec continuing to provide JAB and Mr. Badhwa with confidential and trade secret

information, by JAB and Mr. Badhwa continuing to comply with the requirements of the

Confidentiality Agreement, and by Veritec continuing to pay Mr. Badhwa for his work on behalf

of Veritec and its common-law partnership with JAB.

## JAB AND BADHWA'S WORK WITH VERITEC

73.     Once Veritec's products were developed, Veritec turned to the implementation,

marketing, and sale of the products.

74.     Because Mr. Badhwa had a number of contacts outside of the United States, Veritec

entered into a number of written, oral, and implied-by-law contracts with him, on behalf of JAB,

by which Mr. Badhwa agreed to market Veritec's products in Vietnam, China, and many other

countries around the world, including specifically his home country of Guyana.

15

EXHIBIT A

75.     As part of these agreements, Mr. Badhwa was provided with a copy of Veritec's proprietary and trade secret-protected software programs and source code and installed those products on devices owned and/or operated by JAB and/or Mr. Badhwa.

76.     The information provided to Mr. Badhwa was for the limited purpose of enabling him to develop, market, and/or demonstrate Veritec's products for potential customers of blinxPay™ and blinxPhone™ and no other purpose.

77.     Neither Mr. Badhwa nor JAB was ever provided with a license by Veritec to distribute, sell, create derivative works, disassemble, decompile, or otherwise disclose Veritec's trade secrets or software code for any other reason or purpose.

## VERITEC'S NEGOTIATIONS WITH RENNER

78.     Due to the nature of the services provided by Veritec's blinxPay™, blinxPhone™, and blinx On-Off™ debit cards, Veritec sought to either acquire or establish a relationship with a bank or payment processing entity. Veritec also needed an infusion of investment capital to fund its ongoing growth.

79.     At the recommendation of, and through an introduction from, its attorney, Veritec entered into negotiations with Steve Renner and ADX Labs, LLC regarding a potential investment or partnership opportunities.

80.     At the time, Veritec was generally unaware that Renner had been accused of running a "Ponzi-like" scheme by the former CEO of one of his companies or that his company, now known as Acesse, was forced to refund approximately $16-18 million to its members.

81.     Nor was Veritec aware that Renner had been convicted of four counts of tax fraud in 2009, and had been sentenced to 18 months in prison as a result.

16

EXHIBIT A

82.    Veritec knew only that Renner ran a number of apparently successful companies and had access to a significant amount of investment capital, and that Renner came recommended from Veritec's own trusted legal counsel, who had also invested in Veritec.

83.    In or around mid-to-late 2016, Veritec's CEO, Ms. Tran, met with Renner at his office.

84.    Ms. Tran brought Mr. Badhwa to this meeting with Renner and introduced Mr. Badhwa to Renner for the first time.

85.    Ms. Tran's introduction of Mr. Badhwa, her partner, to Mr. Renner would prove to be a mistake.

86.    The negotiations between Renner and Veritec began after Mr. Badhwa performed a product demonstration of Veritec's blinxPay™ and blinxPhone™ products for Renner and others involved with his companies.

87.    Renner and the others attending the demonstration were impressed by the demonstration and Renner decided to work with Veritec.

88.    Mr. Badhwa was not authorized to provide copies of Veritec's blinxPay™ and blinxPhone™ products to Renner, nor was he authorized to disclose Veritec's trade secret or confidential information or software source code to Renner as part of that demonstration.

89.    Renner knew at this time that Mr. Badhwa/JAB was working in partnership with Veritec and that agreements existed between Veritec on the one hand, and Mr. Badhwa/JAB on the other.

90.    One of the potential partnership opportunities explored by Veritec and Renner involved the potential acquisition of a bank in Montana, called First Citizens Bank.

17

EXHIBIT A

Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

91.     During this process, Veritec entered into a confidentiality agreement (the "Agreement") with Renner and ADX to protect against the disclosure of confidential information dated July 25, 2016 and effective October 1, 2015. Confidential information, as defined by the agreement, could only be used for the purposes of "evaluating the possibilities of making an investment with Veritec or . . . to purchase the bank." As a result, the disclosure of confidential information was limited to a need-to-know basis.

92.     The Agreement also included a "Non-Circumvention" provision, by which both parties agreed not to "circumvent, attempt to circumvent, compete, or attempt to compete with each other."

93.     From July 2016 through late 2017, the parties continued to discuss the potential outlines of an investment or acquisition of a stake in Veritec by Renner and ADX, via a holding company, A2Z Holdings, Inc., in exchange for an infusion of cash and management assistance, among other consideration.

94.     In the process of these negotiations, Veritec, under the protections of the Confidentiality Agreement, provided Renner and his companies with a significant trove of financial, operational, and technological information, seeking to entice investment or other business opportunities with Renner. This included extensive discussions about Veritec's financial status with a number of individuals in Renner's corporate structure, including: the interim CFO of A2Z Holdings, which at one point was the entity proposed to take an ownership stake in Veritec; and Mr. Morris, who was the CFO of ADXNET, the CEO of MobileSoft (another potential acquirer of a stake in Veritec), and CEO of A2Z.

EXHIBIT A

95.     However, Veritec and Renner could not agree on the percentage stake Renner or his companies would acquire in Veritec or the amount of money and control which would remain with Veritec's founders.

96.     Specifically, in exchange for an infusion of approximately $5 million in cash and access to a bank, Renner (through an acquiring entity, A2Z, which was purportedly controlled by Morris) sought to take a 52% stake in Veritec, among other provisions which Veritec found undesirable.

97.     However, Veritec and its founders, Van Thuy Tran and Lawrence Johanns, were not ready to give up a controlling stake in the company, particularly since a prior $5 million offer by one of Renner's other companies, MobileSoft, would only have resulted in the acquisition of a 35% stake in Veritec. As a result, negotiations continued.

98.     In mid-2017, however, negotiations began to falter with Renner and his companies, for reasons then-unknown to Veritec.

99.     On information and belief, Morris and other agents of Renner's companies had begun publicly disparaging Veritec's products, financial condition, and the moral standing of Ms. Tran to third parties and Renner.

100.    Morris referred to Ms. Tran as, among other defamatory statements, a "crook" and a "thief."

101.    Morris began interfering with the negotiations and pushing to circumvent Veritec altogether.

102.    Despite this unsavory behind-the-scenes maneuvering, Veritec remained optimistic that the negotiations would result in investment – until it learned that Mr. Badhwa and JAB, in direct violation of their agreements and duties to Veritec, had begun to work on near-identical

EXHIBIT A

products for Renner and his companies. The negotiations hit a stalemate and were broken off shortly thereafter.

## **MR. BADHWA WORKS FOR RENNER IN VIOLATION OF HIS DUTIES**

103.    It was against this backdrop that Mr. Badhwa and/or JAB, who had provided a number of software and product demonstrations to Renner as part of his negotiations with Veritec, upon information and belief, entered into an agreement with Renner and/or his companies.

104.    On information and belief, Mr. Badhwa and/or JAB entered into an agreement with Renner and/or his companies to develop products.

105.    Mr. Badhwa agreed to develop similar and competing products for Renner and his companies using Veritec's trade secrets and confidential information.

106.    Mr. Badhwa utilized Veritec's patented, trade secret, and copyrighted source code and confidential information to develop similar and competing products, which Renner and his companies branded as "aPay" and "aPhone."

107.    aPay and aPhone currently generate significant revenue for Mobile.net and Renner, along with his associated companies.

108.    Those products are currently available to purchase on Mobile.net's website.

109.    On information and belief, aPay and aPhone are substantially and illegally derived from the patented, trade secret, and copyrighted source code, software, and technology developed and sold by Veritec.

20

EXHIBIT A

## BADHWA THREATENS, AND THEN FILES SUIT, AGAINST VERITEC

110.    In 2017, after Veritec's negotiations with Renner broke down, Mr. Badhwa approached Veritec, demanding, for the first time, payment on the 2009 promissory note.

111.    In response, Veritec confronted Mr. Badhwa about his obvious breaches of duty in developing the aPay mobile application and aPhone mobile device for Renner and his companies, Mr. Badhwa refused to comment on his own breaches, instead threatening that unless Veritec immediately paid the promissory note, he would take Veritec's intellectual property.

112.    On information and belief, the instant lawsuit commenced by Mr. Badhwa was prompted and/or funded by Renner and/or his companies in a bad-faith attempt to obtain through litigation what they could not obtain through investment or licensure – Veritec's valuable products and intellectual property.

## RENNER'S ALTER EGO COMPANIES

113.    On information and belief, a number of Renner's companies were involved in the negotiations with Veritec and the simultaneous and subsequent misappropriation of its trade secrets and confidential business information by Mr. Badhwa, including, but not limited to, the following:

a.  Renner entered into the Agreement individually and on behalf of ADX.

b.  Renner used an email signature block for ADXNET in his communications with Veritec.

c.  Renner intended to use A2Z as a funding source in order to take a majority ownership stake in Veritec, despite A2Z having purportedly independent management.

21

EXHIBIT A

    d.   Renner previously decided to use MobileSoft for the same purpose, again, despite MobileSoft having independent management.

    e.   Renner used shared personnel from many of these entities during the negotiations with an evaluation of Veritec, including, but not limited to, Joe Morris.

    f.   The products developed using Veritec's misappropriated trade secrets and confidential information are now being sold on the website of Mobile.net and potentially other of Renner's companies.

114.    On information and belief, each and every one of the foregoing corporate entities is privately held and is either directly or indirectly, wholly- or majority-owned by Renner.

115.    Renner has abused the foregoing entities' corporate forms for his own enrichment.

116.    On information and belief, the Renner companies have pervasively failed to comply with corporate formalities, because they are not intended to function as separate operating businesses. Instead, they are intended, and operated, as a façade to provide cover for Renner's individual dealings. This is emphasized by the fact that many entities have separate, but apparently non-functioning, officers, such as MobileSoft and A2Z, yet Renner still directed them to offer to purchase stakes in Veritec.

117.    For example, Acesse (f/k/a Inter-Mark Corporation), which was previously raided by federal agents related to allegations of a Ponzi scheme, ADXNET, and ADX all advertise many of the same services, including online eSports leagues, an online gaming service called "GameSmart," and other ventures.

118.    This is not the first time that Renner has operated internet-based money transmission companies for his own benefit.

22

EXHIBIT A

27-CV-18-1218

CASE 0:18-cv-02258-PJS-DTS   Document 1-1   Filed 08/01/18   Page 36 of 54   Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

119.    In 2009, Renner was convicted of tax fraud for evading more than $1.1 million in taxes, according to media reports.

120.    In those charges, Renner was convicted of using money from Cash Cards International, which Renner still operates (according to the Minnesota Secretary of State's office), to pay for his living expenses and coins, oil wells, art, stamps, and musical instruments, as well as to promote his band.

121.    On information and belief, discovery in this matter will uncover myriad other ways in which Renner failed to observe and abused the corporate form for his personal benefit.

122.    Veritec is entitled to pierce the corporate veil and hold Renner, and each of his named companies, liable for the actions alleged herein.

## JAB WAS THE ALTER EGO OF THE BADHWAS

123.    Similarly, while Mr. and Ms. Badhwa operate JAB as a purportedly separate entity, it functions solely as an alter ego for their own business transactions, constituting an illegitimate attempt to limit their personal liability for their actions.

124.    At all times during the business relationship between JAB and Veritec, Mr. Badhwa did not observe corporate formalities related to JAB, and treated JAB and his own work interchangeably. As a result, the existence of JAB was and is nothing more than a façade to shield Mr. Badhwa's personal dealings.

125.    For example, Ms. Badhwa is the titular CEO of JAB, according to the Minnesota Secretary of State's records.

126.    Veritec, however, had no interaction with Ms. Badhwa during the eight-year relationship with JAS/Mr. Badhwa, rendering her a non-functioning officer.

EXHIBIT A

Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

127.    On information and belief, discovery in this matter will uncover myriad other ways in which the Badhwas failed to observe and abused the corporate form.

128.    Veritec is entitled to pierce the corporate veil of JAB and hold Plaintiffs personally liable for the actions of JAB alleged herein.

## COUNT I

(Breach of Confidentiality Agreement – Against JAB and Plaintiffs)

129.    Veritec restates the foregoing paragraphs as if fully set forth herein.

130.    Veritec and JAB entered into the Confidentiality Agreement with an effective date of November 1, 2010.

131.    The purpose of the Confidentiality Agreement was "to enable the parties to explore the possibility of entering into a business or technical alliance."

132.    The Confidentiality Agreement was a binding contract between JAB and Veritec, and was based on a valid offer, acceptance, and exchange of consideration. The Confidentiality Agreement was indefinitely extended by the conduct of the parties.

133.    In the Confidentiality Agreement, JAB agreed to hold Veritec's information confidential, and further agreed not to disclose or disseminate such confidential to any third party.

134.    Despite the promises JAB made in the Confidentiality Agreement, JAB, through the person of Mr. Badhwa, disclosed Veritec's confidential business information, including financial information, technical specifications, source code, and other confidential information and trade secrets, to third parties, including Renner, Renner's associated companies, and others.

135.    This disclosure constituted a material breach of the Confidentiality Agreement.

EXHIBIT A

136.    As the foreseeable and but-for result of the breach, Veritec suffered significant damages in an amount to be proven at trial, but in no event less than $50,000.

## COUNT II

(Breach of Confidentiality Agreement – Against ADX and Renner)

137.    Veritec restates the foregoing paragraphs as if fully set forth herein.

138.    Veritec entered into a valid and binding contract between itself on one hand and ADX and Renner on the other. This Confidentiality Agreement was based on a valid offer, acceptance, and consideration.

139.    The Confidentiality Agreement between Veritec, ADX, and Renner included a non-circumvention provision, which acknowledges the time, effort, and money invested by each party into the acquisition of a bank to support Veritec's BIN and mobile payment technology. In recognition thereof, the parties agreed not to circumvent or compete with each other.

140.    Renner and ADX subsequently hired JAB and/or David Badhwa to develop a secure payment application and phone, called "aPay" and "aPhone," respectively, which directly compete with and, on information and belief, are based on the misappropriated source code from Veritec's products, blinxPay™ and blinxPhone™.

141.    These actions by Renner and ADX violated the non-circumvention provision of the Agreement between and amongst Veritec, Renner, and ADX and constituted a breach of that Agreement.

142.    Renner was at all relevant times an agent of ADX, such that his actions are attributable to ADX.

EXHIBIT A

143. Veritec has suffered significant damages as a result of the Breach of the Agreement, and is entitled to direct, incidental, and consequential damages in excess of $50,000, with the exact amount to be determined at trial.

## COUNT III

(Breach of Fiduciary Duty – Against JAB and Mr. Badhwa)

144. Veritec restates the foregoing paragraphs as if fully stated herein.

145. JAB and Mr. Badhwa were at all relevant times agents, co-joint venturers, partners, and/or contractors to Veritec, and as such owed Veritec the duties set forth in the Minnesota common law, including the duty of good faith, the duty to disclose material facts, and to act in an honest, fair, and reasonable manner with respect to the interests of Veritec.

146. JAB and Mr. Badhwa engaged in myriad breaches of the aforementioned duties with respect to their dealings with Veritec and Renner (and his companies).

147. As discussed herein, JAB and Mr. Badhwa misappropriated and disclosed Veritec's trade secrets and confidential information, without right, to third parties including Renner and his companies. This information included, but is not limited to, Veritec's technological, financial, and other information, along with Veritec's software source code, development information, and production and supply-chain information.

148. JAB and Mr. Badhwa also took actions which placed them in direct competition with Veritec, including by developing similar and competing products to those developed and sold by Veritec for Renner and his companies.

149. Furthermore, JAB and Mr. Badhwa failed to disclose to Veritec that they were taking the actions set forth above and herein, in violation of their duty to disclose material facts.

26

EXHIBIT A

27-CV-18-1218

CASE 0:18-cv-02258-PJS-DTS   Document 1-1   Filed 08/01/18   Page 40 of 54   Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

150.     The above-stated actions and omissions of JAB and Mr. Badhwa constitute a violation of their fiduciary duties owed to Veritec.

151.     As a direct and proximate result of JAB and Mr. Badhwa's above-described breaches of fiduciary duty, Veritec is entitled to direct, incidental, and consequential damages in excess of $50,000, the exact amount to be determined at trial, and other equitable relief available under the common law.

152.     As discussed at further length above, JAB is the mere alter ego of Mr. Badhwa and Ms. Badhwa, and Veritec is entitled to pierce JAB's corporate veil to seek damages for the actions of JAB directly from the Badhwas.

## COUNT IV

(Usurpation of Business Opportunity – Against Plaintiffs and JAB)

153.     Veritec restates the foregoing paragraphs as if fully set forth herein.

154.     Minnesota law precludes an agent, co-joint venturers, partner, and/or contractor from appropriating a business opportunity which rightfully belongs to principal or partnership.

155.     Here, JAB and Mr. Badhwa were at all times agents, partners, and/or contractors to Veritec, and as such owed Veritec duties of good faith and loyalty.

156.     Among these duties was to not misappropriate business opportunities which Veritec intended, or was rightfully entitled, to pursue.

157.     Beginning in 2016, Veritec entered into negotiations with Renner and his associated companies, including Acesse, ADXNET, ADX, and A2Z, to license Veritec's products, including, but not limited to, blinxPay™, blinxPhone™, and other products.

EXHIBIT A

158.    Veritec was further involved in discussions with Renner and his companies which, if successful, would have resulted in a substantial infusion of investment capital into Veritec, along with other benefits, such as the acquisition of a bank to serve as host for Veritec's BIN and mobile payment technologies.

159.    JAB and Badhwa had knowledge of these negotiations, as Mr. Badhwa was involved in product demonstrations and the provision of information to Renner and his companies.

160.    Despite knowledge of these business opportunities, and of Veritec's intent to pursue those opportunities, JAB and Mr. Badhwa usurped the business opportunities by entering into discussions and arrangements directly with Renner and his companies.

161.    If not for JAB and Mr. Badhwa's actions, Veritec would have successfully pursued these business opportunities.

162.    As a result of JAB and Mr. Badhwa's actions, Veritec suffered significant damages in an amount to be proven at trial, and is entitled to direct, incidental, and consequential damages in excess of $50,000, including the loss of millions of dollars of investment capital and an ongoing relationship with a bank to host Veritec's BIN and mobile payment technologies.

163.    As discussed at further length above, JAB is the mere alter ego of Mr. Badhwa and Ms. Badhwa, and Veritec is entitled to pierce JAB's corporate veil to seek damages for the actions of JAB directly from the Badhwas.


## COUNT V

(Tortious Interference with Contract – Against Renner, Morris, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net)

164.    Veritec restates the foregoing paragraphs as if fully stated herein.

EXHIBIT A

Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

165.    Veritec had a valid and enforceable contractual relationship with JAB and David Badhwa in the form of a series of oral and written agreements governing the services provided by JAB and Mr. Badhwa related to developing, marketing, and distributing Veritec's products and services.

166.    Renner, Morris, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net, and each of them, had actual and constructive knowledge of Veritec's contractual relationship with JAB and David Badhwa.

167.    Renner, Morris, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net, through their own actions and those of their agents, intentionally interfered with Veritec's contractual relationship with David Badhwa.

168.    Renner, Morris, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net were not justified in interfering with the contractual relationship with David Badhwa.

169.    As a direct and proximate result of the actions of Renner, Morris, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net, through their agents, Veritec has been harmed and is entitled to direct, incidental and consequential damages in excess of $50,000, with the exact amount to be determined at trial.

## COUNT VI

(Intentional Interference with Prospective Economic Advantage – Against Plaintiffs and JAB)

170.    Veritec restates the foregoing paragraphs as if fully stated herein.

171.    As a result of their above-described actions and omissions, Plaintiffs and JAB have intentionally interfered with Veritec's prospective economic advantage related to its relationship with Renner, Acesse, ADXNET, ADX, A2Z, MobileSoft, and Mobile.net.

29

EXHIBIT A

Filed in Fourth Judicial District Court
6/28/2018 3:05 PM
Hennepin County, MN

172.    Plaintiffs and JAB were not justified in interfering with Veritec's prospective economic advantage.

173.    As a direct and proximate result of Plaintiffs and JAB's actions, Veritec has been harmed and is entitled to direct, incidental, and consequential damages in excess of $50,000 with the exact amount to be determined at trial.

## COUNT VII

(Common Law Business Defamation – Against Morris, MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z)

174.    Veritec restates the foregoing paragraphs as if fully stated herein.

175.    At all times relevant to the instant action, Morris acted within the scope of his employment with MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z, and his actions and statements are thereby attributable to those entities.

176.    When Morris made false and misleading statements regarding the character and ethics of Veritec and its founder and Chief Executive Officer, Ms. Tran, to Renner and other third parties, he disparaged the business of Veritec.

177.    Specifically, Morris described Ms. Tran as a "crook" and described Veritec as an unethical company. Morris made these statements while Veritec was in the process of negotiating a potential investment and acquisition of a bank to host Veritec's BIN and mobile payment technologies with Renner and his companies.

178.    These statements constitute false or misleading representations of objective fact.

179.    Veritec suffered actual and measurable special damages as a result of Morris's statements, which are attributable to MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z, as such statements directly caused Renner to terminate negotiations with Veritec.

EXHIBIT A

180.     Moreover, as a result of Morris's actions, which are attributable to MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z, Veritec suffered a significant and measurable decline in business.

181.     As a result, Veritec is entitled to damages in an amount to be proven at trial, but in an amount no less than $50,000.

## COUNT VIII

(Violation of Minnesota Uniform Deceptive Trade Practices Act – Against Morris, MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2D)

182.     Veritec restates the foregoing paragraphs as if fully stated herein.

183.     At all times relevant to the instant action, Morris acted within the scope of his employment with MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z, and his actions and statements are thereby attributable to those entities.

184.     Under the MUDTPA, it is unlawful for a person to "disparage the goods, services, or business of another by false or misleading representation of fact" in the course of business, vocation, or occupation. Minn. Stat. § 325D.44, Subd. 1 ¶ 8.

185.     When Morris made false and misleading statements regarding the character and ethics of Veritec and its founder and Chief Executive Officer, Ms. Tran, among other such statements, to Renner and other third parties, he disparaged the business of Veritec.

186.     Specifically, Morris described Ms. Tran as a "crook" and described Veritec as an unethical company, and made false and misleading statements regarding Veritec's value and financial status. Morris made these statements while Veritec was in the process of negotiating a potential investment and acquisition of a bank to host Veritec's BIN and mobile payment technologies with Renner and his companies.

31

EXHIBIT A

187.    These statements constitute false or misleading representations of objective fact made in the course of Morris's business and employment, in violation of MUDTPA.

188.    Veritec suffered actual and measurable special damages as a result of Morris's statements, which are attributable to MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z, as such statements directly caused Renner to terminate negotiations with Veritec.

189.    Moreover, as a result of Morris's actions, which are attributable to MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z, Veritec suffered a significant and measurable decline in business.

190.    As a result, Veritec is entitled to damages in an amount to be proven at trial, but in an amount no less than $50,000.

## COUNT IX

(Misappropriation of Trade Secrets and Confidential Information under the Minnesota Uniform Trade Secrets Act and Common Law – Against David Badhwa, JAB, Denise Badhwa, Renner, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net)

191.    Veritec restates the foregoing paragraphs as if fully stated herein.

192.    The Minnesota Uniform Trade Secrets Act creates an independent statutory obligation upon Defendants not to misappropriate Veritec's trade secrets.

193.    While JAB and Mr. Badhwa worked for and with Veritec, they had access to and acquired Veritec's trade secrets and confidential information.

194.    These trade secrets and confidential information included, but are not limited to, the details and specifics regarding the following: (1) the source code for all of Veritec's products, including the blinxPay mobile application and the blinxPay mobile phone; (2) Veritec's software solution to encode the blinxPay application into the blinxPay mobile phone, which is required to

32

EXHIBIT A

natively run the blinxPay application on a mobile phone; and (3) Veritec's processes for installing the blinxPay application on mobile phones and tablets. These trade secrets were not readily ascertainable by others without access to the trade secrets.

195.    These trade secrets (and the details regarding these trade secrets) and confidential information separated Veritec from its competition and made it unique in the industry. Veritec derived economic value from these trade secrets and confidential information because they provided the ability to engage in peer-to-peer transfers of funds from applications hard-coded into mobile devices without the download and installation of a mobile application from a third party application store. Further, these trade secrets and confidential information were sufficiently secret to allow Veritec to derive economic value from them not being generally known by, *e.g.*, Veritec's competitors.

196.    Veritec attempted to maintain the secrecy and confidentiality of these trade secrets by, among other things, obligating third parties, such as JAB, to agree not to disclose or use that information without Veritec's consent.

197.    When JAB and Mr. Badhwa acquired Veritec's trade secrets and confidential information in the course of their work as agents, partners, and/or contractors to Veritec, they knew or had reason to know that their access to and acquisition of those trade secrets and confidential information was subject to a duty to maintain their secrecy and that Veritec intended that the information in question remain secret.

198.    Despite this knowledge, Mr. Badhwa and JAB misappropriated these trade secrets and confidential information in 2017 by improper means – through the breach of the Confidentiality Agreement and other agreements between Veritec, JAB, and Mr. Badhwa – and

33

EXHIBIT A

when they used those trade secrets to develop similar and competing products for the benefit of

Veritec's competitors, Renner, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net.

199.    JAB and Mr. Badhwa did this without Veritec's express or implied consent.

200.    As discussed at further length above, JAB is the mere alter ego of Mr. Badhwa and

Ms. Badhwa, and Veritec is entitled to pierce JAB's corporate veil to seek damages for the actions

of JAB directly from the Badhwas.

201.    As a result of the confidential relationship between Veritec and Renner, Acesse,

ADXNET, ADX, MobileSoft, and Mobile.net related to the potential investment in Veritec and

acquisition of a financial institution to host Veritec's BIN and mobile payment systems, Renner,

Acesse, ADXNET, ADX, MobileSoft, and Mobile.net had a duty not to misappropriate Veritec's

trade secrets and confidential information.

202.    In turn, when Renner, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net

received Veritec's trade secrets from JAB and Mr. Badhwa, they knew or had reason to know that

their access to and acquisition of those trade secrets and confidential information was subject to a

duty to maintain their secrecy and that Veritec intended that the information in question remain

secret.

203.    Despite this knowledge, Renner, Acesse, ADXNET, ADX, MobileSoft, and

Mobile.net misappropriated these same trade secrets when they used these trade secrets to develop

similar and competing products to those developed by Veritec, including specifically the "aPay"

mobile application and the "aPhone" and "aTablet" mobile devices, and began offering those

products for sale on Mobile.net's website.

204.    Renner, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net did this without

Veritec's express or implied consent.

34

EXHIBIT A

205.     Veritec has been irreparably harmed by the tortious and illegal acts of Mr. Badhwa, JAB, Renner, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net. That harm includes, but is not limited to, the unlawful disclosure and use of Veritec's trade secret and confidential information, loss of incalculable business due to their use of Veritec's trade secrets in similar and competing products, and loss of customer good will if they are allowed to continue disclosing and using Veritec's trade secrets.

206.     As a direct and proximate result of JAB, Mr. Badhwa, Ms. Badhwa, Renner, Acesse, ADXNET, ADX, MobileSoft, and Mobile.net's misappropriation of Veritec's trade secrets and confidential information, Veritec has suffered damages in an amount to be proven at trial in excess of $50,000.

207.     Veritec is further entitled to its attorneys' fees pursuant to the Minnesota Uniform Trade Secrets Act.


## COUNT X

(Conversion; Civil Theft – Against Plaintiffs and JAB)

208.     Veritec restates the foregoing paragraphs as if fully stated herein.

209.     As part of the partnership, joint venture, or other business relationship between Veritec and JAB/Mr. Badhwa, Veritec paid for the creation of demo kits and demonstration models of its products for Mr. Badhwa to use at trade shows.

210.     Specifically, JAB and Mr. Badhwa invoiced Veritec for the costs of creating the demo kits and demonstration models of its products as quoted by the manufacturers of the products in China.

35

EXHIBIT A

211.    Veritec further permitted JAB and the Badhwas to install Veritec's software on phones owned by JAB and the Badhwas to permit those phones to be used at trade shows and demonstrations.

212.    Veritec did not convey any ownership interest in its software, demo kits, or demonstration models of its phones to JAB or the Badhwas.

213.    Veritec thereby holds a property interest in such demo kits, demonstration models of its products, and the software installed on JAB or the Badhwas' phones or other mobile devices.

214.    JAB and the Badhwas have willfully interfered with Veritec's property interests in its demo kits, demonstration models of its products, and the software installed on JAB or Plaintiffs' phones or other mobile devices.

215.    By misappropriating and retaining without right the foregoing items and software, JAB and the Badhwas have deprived Veritec of its interest in, use of, and possession of such items and software.

216.    JAB is vicariously liable for the actions of the Badhwas undertaken at JAB's direction, for JAB's benefit, or which JAB should have foreseen or actually did foresee as a result of the relationship between JAB and Veritec.

217.    As discussed at further length above, JAB is the mere alter ego of Mr. Badhwa and Ms. Badhwa, and Veritec is entitled to pierce JAB's corporate veil to seek damages for the actions of JAB directly from the Badhwas.

218.    The actions of JAB and the Badhwas have damaged Veritec in an amount to be proven at trial.

EXHIBIT A

219.     Veritec is entitled to the return of the items and software set forth above or to recover the values of the items and software as of the date they were taken, plus an additional one hundred percent (100%) of their value and attorneys' fees pursuant to Minn. Stat. § 604.14.


## COUNT XI

(Aiding and Abetting – Against Renner, Morris, MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z)

220.     Veritec restates the foregoing paragraphs as if fully stated herein.

221.     Renner, Morris, MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z aided and abetted JAB and David Badhwa's usurpation of Veritec's business opportunity and their breach of their fiduciary duties to Veritec, as described herein.

222.     As a direct and proximate result of Renner, Morris, MobileSoft, Mobile.Net, Acesse, ADXNET, ADX, and A2Z's wrongful conduct, Veritec has been harmed and is entitled to direct, incidental, and consequential damages in excess of $50,000, the exact amount to be determined at trial.


## COUNT XII

(Conspiracy – Against All Defendants)

223.     Veritec restates the foregoing paragraphs as if fully stated herein.

224.     By their above-described actions and omissions, Defendants have actively or tacitly conspired together to deprive Veritec of its rights under Minnesota law.

225.     As a direct and proximate result of this unlawful conspiracy, Veritec has been harmed and is entitled to direct, incidental, and consequential damages in excess of $50,000, the exact amount to be determined at trial.

EXHIBIT A

## COUNT XIII

### (Unjust Enrichment – Against All Defendants)

226.    Veritec restates the foregoing paragraphs as if fully stated herein.

227.    As a result of their above-described actions and omissions, Defendants have been unjustly enriched, and Veritec has been unjustly injured, in an amount in excess of $50,000.

228.    As a result of Defendants' above-described actions and omissions, Veritec is entitled to an accounting and constructive trust of all value generated as the result of the misappropriation of Veritec's confidential information and trade secrets, and any revenues from the sale of products incorporating or using the same.

## JURY DEMAND

Veritec hereby respectfully demands a trial by jury on all counts so triable.

## PUNITIVE DAMAGES RESERVATION

Veritec hereby respectfully reserves the right to seek leave of court to amend its Verified Counterclaims and Third Party Complaint to assert a claim for punitive damages at the proper time.

## PRAYER FOR RELIEF

WHEREFORE, Veritec respectfully requests that the Court grant relief against Counter-Defendants David and Denise Badhwa and Third Party Defendants JAB Companies, Inc., Acesse

EXHIBIT A

Corporation, ADXNET, Inc., ADX Labs, LLC, A2Z Holdings, Inc., MobileSoft Technology, Inc.,

Mobile.net, Steve Renner, and Joseph Morris, jointly and severally, as follows:

1.  Awarding a judgment against Defendants and in favor of Veritec for all direct, incidental, and consequential damages in an amount to be determined at trial in excess of $50,000, including an additional one hundred percent of the value of the property which was stolen pursuant to Minn. Stat. § 604.14;

2.  An accounting, constructive trust, and recoupment of all funds and property improperly received and earned by Defendants as a result of the usurpation of Veritec's business opportunity, misappropriation of Veritec's confidential information and trade secrets, and all revenues from the sale of products incorporating or using the same;

3.  Awarding Veritec the costs, disbursements, and attorneys' fees incurred in this action as appropriate and available pursuant to Minnesota law;

4.  Awarding prejudgment and post-judgment interest as allowed by law; and

5.  Awarding Plaintiff such other and further relief as the Court may deem just and equitable.

Dated: June 28, 2018                **RESPECTFULLY SUBMITTED,**

                                    */s/ Eric D. Olson*
                                    Troy J. Hutchinson (No. 0320420)
                                    thutchinson@rockhutchinson.com
                                    Eric D. Olson (No. 0398964)
                                    eolson@rockhutchinson.com
                                    **ROCK HUTCHINSON PLLP**
                                    2050 Canadian Pacific Plaza
                                    120 South Sixth St.
                                    Minneapolis, MN 55402
                                    Phone: (612) 573-3688
                                    Facsimile: (612) 330-0959

                                    ***Counsel for Defendant Veritec, Inc.***

EXHIBIT A

## ACKNOWLEDGEMENT

The undersigned hereby acknowledges that sanctions may be imposed under Minn. Stat.

§ 549.211.


*/s/ Eric D. Olson*
Eric D. Olson

EXHIBIT A

## VERIFICATION

STATE OF MINNESOTA   )
                              )
COUNTY OF HENNEPIN   )

I, Van Thuy Tran, the Chief Executive Officer and Founder of Veritec, Inc., being first duly sworn, state that I have been provided with a copy of the foregoing Verified Answer, Affirmative Defenses, Counterclaims, and Third-Party Complaint, that I have reviewed the admissions, denials, and allegations set forth therein, that I have personal knowledge of the information contained therein, that the same is true to my knowledge, except as to matters stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury that everything I have stated int his document is true and correct.

Dated: June 28, 2018

_____
Van Thuy Tran

40

EXHIBIT A