UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

-------------------------------------------------------------

|  |  |
|---|---|
| David A. Badhwa and Denise A.<br>Badhwa, | )<br>) File No. 16-cv-2258<br>)          (PJS/DTS)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| Veritec, Inc., | ) Courtroom 9E<br>) Minneapolis, Minnesota |
| Defendant, | ) September 10, 2018<br>) 3:00 p.m. |
| and | )<br>) |
| Veritec, Inc., | )<br>) |
| Counter-Plaintiff and<br>Third-Party Plaintiff, | )<br>) |
| v. | )<br>) |
| David A. Badhwa and Denise A.<br>Badhwa, | )<br>)<br>) |
| Counter-Defendants, | )<br>) |
| and | )<br>) |
| JAB Companies, Inc., Acesse<br>Corporation, ADXNET, Inc., ADX<br>Labs L.L.C.,A2Z Holdings, Inc,<br>MobileSoft Technology, Inc.,<br>Mobile.net LLC, Steven Renner<br>and Joseph Morris, | )<br>)<br>)<br>)<br>)<br>) |
| Third-Party Defendants. | ) |

-------------------------------------------------------------

BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(MOTIONS HEARING)**

1  <u>APPEARANCES</u>

    For the Plaintiffs and      FREDRIKSON & BYRON PA
2   Counter-Defendants          BY:  JOSEPH J. CASSIOPPI, ESQ.
    David A. Badhwa and         200 South Sixth Street, #4000
3   Denise A. Badhwa and        Minneapolis, Minnesota 55402
    Third-Party Defendant
4   JAB Companies, Inc.:

5

    For the Defendant,          ROCK HUTCHINSON PLLP
6   Counter-Plaintiff and       BY:  TROY J. HUTCHINSON, ESQ.
    Third-Party Plaintiff            ERIC D. OLSON, ESQ.
7   Veritec, Inc.:              120 South Sixth Street, #2050
                                Minneapolis, Minnesota 55402
8

9   For the Third-Party         GRAY PLANT MOOTY MOOTY &
    Defendants, except not         BENNETT PA
10  Third-Party Defendant       BY:  LOREN L. HANSEN, ESQ.
    JAB Companies, Inc.:        80 South Eighth Street, #500
11                              Minneapolis, Minnesota 55402

12

    Court Reporter:             RENEE A. ROGGE, RMR-CRR
13                              1005 United States Courthouse
                                300 South Fourth Street
14                              Minneapolis, Minnesota 55415

15  Also Present:               Van Tran, CEO of Veritec, Inc.
                                Jon Hopeman, Esq., Gen. Counsel
16

17     Proceedings recorded by mechanical stenography;
    transcript produced by computer.
18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2                  **IN OPEN COURT**

3

4          THE COURT:  Good afternoon, everyone.  Please be

5     seated.

6          All right.  So we are on the record in the matter

7     of Badhwa, et al, versus Veritec, Inc., et al., Case

8     No. 18-cv-2258.

9          I guess third-party plaintiff's counsel, if you

10     would note your appearances for the record, please.

11          MR. HUTCHINSON:  Good afternoon, Your Honor.  Troy

12     Hutchinson on behalf of Veritec, Inc.

13          THE COURT:  Good afternoon, Mr. Hutchinson.

14          MR. OLSON:  Good afternoon, Your Honor.  Eric

15     Olson on behalf of Veritec, Inc., and with me today is

16     Veritec CEO Van Tran.

17          THE COURT:  Good afternoon, Ms. Tran and

18     Mr. Olson.

19          And for the third-party defendants, please.

20          MR. HANSEN:  Good afternoon, Your Honor.  Loren

21     Hansen.  I represent the ADX-related entities.  And with me

22     today is Jon Hopeman, general counsel.

23          MR. CASSIOPPI:  Good afternoon, Your Honor.  Joe

24     Cassioppi from Fredrikson & Byron.  I represent the original

25     plaintiffs here, David and Denise Badhwa, as well as

1    third-party defendant JAB Companies.

2              THE COURT:  Okay.  Very well.

3              Good afternoon, Mr. Hansen, Mr. Hopeman and

4    Mr. Cassioppi.

5              All right.  Well, it's a little bit of an odd

6    procedural posture right now.  Maybe Mr. Hutchinson or

7    Mr. Olson, whoever is going to argue, why don't you start

8    for a second.  So come on up.

9              I have first sort of an observation that leads to

10   a question, which is just to give you background on how this

11   all got started.  Obviously, we review complaints whenever

12   they come in to spot if there are any jurisdictional issues

13   or not, and this one I happened to spot, otherwise Judge

14   Schiltz upstairs always does the same thing.  And so when I

15   ask for people to tell us what the jurisdictional basis was,

16   I got the two briefs, which struck me as pretty clearly

17   saying one party is saying it's got to get remanded to state

18   court -- you guys saying that, I believe -- and the other

19   side saying not.  But I also noticed in your filing then

20   that you have got a statement that, to the effect, that

21   regardless of today's hearing you also have a motion to

22   remand or will file a motion to remand.  So I want to make

23   sure if that's the case, what the reason for that is,

24   because I can tell you that Judge Schiltz believes this to

25   be a motion to remand that he's referred to me, but if

1    there's a reason for it or a different standard or whatever

2    it is.

3              MR. HUTCHINSON:  Sure.  Your Honor, we're on the

4    same page.

5              THE COURT:  Okay.

6              MR. HUTCHINSON:  I think that reference was prior

7    to Judge Schiltz referring the motion to you.  I mean,

8    obviously, a motion to remand is deemed dispositive.  So we

9    had initially calendared a hearing date with Judge Schiltz,

10   and there would have been a briefing schedule keyed off of

11   that hearing date, but we don't need to do that at this

12   point.

13             THE COURT:  Okay.  Good.  So the next question or

14   the next observation I have is it's not entirely clear to

15   me, and I am not going to pretend that I'm a maven of the

16   Rules of Civil Procedure, but under Rule 14, I guess it

17   would be the state rule, at least to begin, is this a proper

18   third-party complaint?  Let's start there, if we could.

19             MR. HUTCHINSON:  We believe it is, yes, Your

20   Honor.

21             THE COURT:  Because the text to the rule

22   specifically says, in essence, if you are sued by a

23   plaintiff, you can bring a third-party complaint against

24   somebody who, if you owe the plaintiff, owes you.  That's

25   obviously a drastic paraphrase, but that, in essence, is the

1    way I read the rule.

2            And then there's also a reference then that if

3    there are other claims against a third party, those would be

4    properly -- they would properly be brought in pursuant to

5    Rule 19 or Rule 20.

6            So the first question is, Am I right, Am I wrong,

7    Does it matter.

8            MR. HUTCHINSON:  Well, whether we filed the

9    third-party complaint pursuant to Rule 14 or whether it

10   would be a joinder under Rule 19 or 20, I am not sure if it

11   matters.  I mean, I had planned on giving the court a little

12   bit of background to start out with, but I think

13   Mr. Badhwa's initial claim and the counterclaims that

14   Veritec has against Mr. Badhwa relate to the same nucleus of

15   facts that give rise to these third-party complaints.  So I

16   am not sure if it matters.  I would note, you know, we filed

17   one, sort of, omnibus pleading that is both a counterclaim

18   and then a third-party claim against Mr. Renner and his

19   entities.

20           THE COURT:  Okay.  Go ahead then.

21           MR. HUTCHINSON:  Okay.  Well, just to give the

22   court a little bit of background on what we're talking about

23   here, Veritec's business -- and there's other aspects to its

24   business.  They have been around since the '80s, but the

25   business that's at issue in this case involves mobile

1       payment technology.  Veritec built a software platform for

2       mobile payment applications, and these applications allow

3       users to pay for things at merchants and to use a smartphone

4       as a payment device and also to allow people to make

5       payments to other individuals.  Veritec also customized its

6       own smartphone that would come preloaded with those

7       applications on it.

8               And in 2016 Veritec was looking to grow this

9       mobile payment business and was looking for funding, and its

10      attorney at the time introduced Veritec to Mr. Renner.

11      Veritec's founder, Ms. Van Tran, then met with Mr. Renner

12      for the purpose of exploring an equity fundraising

13      transaction.  At that time Mr. Renner didn't have a mobile

14      payment platform or application and he didn't -- he wasn't

15      selling a smartphone, and Mr. Renner expressed interest in

16      investing in Veritec.  And, notably, the attorney who made

17      this introduction is now Mr. Renner's CEO.

18              So pursuant to this introduction, Mr. Renner

19      signed a confidentiality agreement with Veritec, which also

20      included an agreement not to compete with Veritec.  Under

21      the protections of that agreement, Ms. Tran introduced

22      Mr. Renner to the key people, her key partners that she was

23      building this mobile payment business with.  Those include

24      Mr. David Badhwa, Veritec's business partner, who is a

25      software engineer by trade.  Mr. Badhwa and Veritec had a

1    contractual relationship.  Ms. Tran also introduced

2    Mr. Renner to Veritec's lead software engineer,

3    Mr. Yoshihide Shimada.

4         In addition, Mr. Renner conducted extensive due

5    diligence of Veritec's business model under the protections

6    of that confidentiality agreement and was given access to

7    essentially everything in the company, including financial

8    records.  Veritec also significantly disclosed to Mr. Renner

9    its distribution plans and disclosed that Mr. Badhwa was the

10   key player in that and it was Mr. Badhwa who was charged

11   with finding these sales channels.

12        Ultimately, Mr. Renner, after conducting this

13   extensive due diligence, put forth a formal proposal via

14   email to Veritec offering to invest $5 million in exchange

15   for 52 percent of the company.  Veritec ultimately declined

16   that offer, and no deal was made at that time.

17        Now, following all of this and following the

18   extensive due diligence, Mr. Renner -- and I use Mr. Renner

19   to describe both him and his various entities -- developed

20   and brought to market strikingly similar products, including

21   both a mobile payment application and an associated

22   smartphone.  Now, this is clearly a breach of the noncompete

23   agreement that Mr. Renner signed with Veritec.

24        And Mr. Renner did not, however, create this

25   competing business alone.  He had help, and that help came

1      from Mr. Badhwa, who Mr. Renner took to work for him, and

2      Mr. Shimada, as well as Veritec's former attorney.  And this

3      was all done under cover of darkness without Ms. Tran's

4      knowledge.

5              Most startling, Mr. Renner's smartphone is

6      actually made in the very same factory in Asia that

7      Veritec's phone was made in.  And it's Mr. Badhwa who had --

8      or Mr. Shimada, rather, who found that factory for Veritec.

9              So, in short, after signing a confidentiality

10     agreement and it contained an agreement not to compete and

11     engaging in significant due diligence, instead of following

12     through on a transaction to invest in Veritec, Mr. Renner

13     stole Veritec's business, hired its key people, used its

14     contacts, used its factory and its distribution plans and

15     created a competing business for zero dollars, rather than

16     the 5 million that he had offered to invest in exchange for

17     52 percent.

18             These facts are what this case is about.  This is

19     essentially a breach of contract case involving some related

20     tort actions that stem out of the contracts at issue.  There

21     are no allegations of copyright infringement.  There are no

22     allegations of patent infringement.  It's true that Veritec

23     owns copyrights and patents, but there is no allegation that

24     the defendants have infringed any of those.  And none of

25     Veritec's claims require resolution of questions of

1     copyright or patent law.

2          The initial complaint did allege that discovery

3     may reveal evidence of infringement.  And that pleading has

4     two implications.  One is it is saying right now there is no

5     evidence of infringement, there is no Rule 11 basis to bring

6     a claim of infringement; and, two, if discovery may reveal

7     evidence of infringement, the implication is that it may

8     not.  And since we filed that initial complaint, we have

9     amended and removed those allegations.  And that comes after

10    several meetings with opposing counsel and Mr. Renner, where

11    they have made clear that there is no infringement and

12    Veritec in turn has made clear that, you know, we are not

13    bringing a claim for copyright or patent infringement.

14          Mr. Renner also -- he relies on the case of *3M

15    versus Avery Dennison* to argue that Veritec's reference to

16    discovery perhaps revealing evidence of infringement, to

17    argue that there is an actual case or controversy here, but

18    that *3M* case is very different.  And there the court found

19    that 3M was justified in proactively filing declaratory

20    judgment claims, because the court noted that there was a

21    legitimate fear that Avery Dennison might escalate the

22    dispute and file infringement claims, and the court based

23    that on a number of factors beyond just the reference that

24    there may be infringement.  And, notably, 3M and Avery

25    Dennison had been engaged in prior patent litigation.

1        But, more significantly, after counsel for Avery

2   Dennison said that 3M may be infringing, counsel for the two

3   parties met, 3M said we are not infringing and Avery

4   Dennison then escalated things.  They said, well, we are

5   going to send you a claim chart.  So the court found that

6   that remark, that threat to send a claim chart, escalated

7   the dispute and that created a real legitimate fear for 3M

8   that there was going to be a filing that was going to be

9   forthcoming.

10        THE COURT:  Hang on a second.  When you say in the

11   initial complaint -- I could have sworn I saw it again in

12   the amended complaint, but I don't see it there now.  But in

13   the initial complaint when you say discovery may reveal

14   evidence of an infringement, to me that sounds like a pretty

15   clear threat that, A, we're going to look for or at least

16   we're going to have our eyes open for evidence of potential

17   infringement, from which it follows and if we find it we're

18   going to do something about it.  So why isn't that enough of

19   an actual case or controversy and an imminent threat?

20        MR. HUTCHINSON:  Well, because we didn't make a

21   threat.  We said discovery may show it, and it may.  And

22   that's true, you know, Your Honor, that would be true in any

23   noncompete case where an employer hired somebody's engineer

24   or a scientist that had access to patents and copyrights.

25   There is always a threat that there would be infringement

1     that would follow.

2            Here, the key facts that make our case different

3     from *Avery Dennison* is that here Veritec actually filed a

4     lawsuit.  In *Avery Dennison* the court was concerned -- and

5     dec j actions in patent cases also often come where there's

6     been a threat of litigation, but there's no litigation

7     pending.  And that was true in *Avery Dennison*.  Here, there

8     wasn't a threat.  We filed a lawsuit, but it didn't contain

9     any allegations of infringement, so there was no real threat

10    here presented by Veritec that a patent infringement action

11    was going to follow.  And, in fact, in a verified pleading

12    Veritec actually said we don't have any evidence of

13    infringement, discovery may reveal that there is.

14           But here really what the pleading was about

15    initially was, you know, explaining to the reader of the

16    complaint that we are dealing with a real business here,

17    that they do have patents, they do have copyrights, they had

18    a valuable business they were protecting, but we don't have

19    any evidence of infringement.  We didn't bring claims of

20    infringement.  We have never threatened to bring claims of

21    infringement.

22           So that's what makes this case markedly different

23    than *Avery Dennison*, but beyond that, Your Honor, that was

24    the initial complaint.  We have amended the complaint.

25    There is no more reference to what discovery may or may not

1     reveal, because in our discussions with Mr. Renner's counsel

2     they have convinced us that there is no infringement.  In

3     fact, they have said that the patents -- there is no patent

4     for the smartphone and that any patents that existed either

5     lapsed or have been assigned to somebody else.  They have

6     also said in their pleadings before this court that there's

7     no copyright covering the software at issue.  So, you know,

8     we don't have any facts that would be contrary to their

9     assertions.  But more importantly --

10          THE COURT:  But their assertions are largely

11    irrelevant to the question -- because the potential

12    defendant always says there's no patents, there's no

13    infringement; if there are patents or copyrights, yeah, they

14    are not valid.  So the fact that they say, yeah, you are not

15    infringing or we're not infringing doesn't really control, I

16    don't think, the question of whether there's a controversy,

17    because the controversy is governed by what you say, not

18    what they say.

19          MR. HUTCHINSON:  Right.  And the only thing that

20    Veritec has said is, well, which was quite a while ago --

21          THE COURT:  Which was taken out.

22          MR. HUTCHINSON:  -- and it's been removed now --

23    and, you know, in this district Judge Kyle in *Uncommon*

24    *versus Wiese*, a case in which the plaintiff expressly filed

25    patent infringement claims in state court, the defendant

1    then removed, plaintiff then amended the complaint, removed

2    the patent infringement claims and left only a state court

3    breach of contract claim, and Judge Kyle held in that case,

4    and he just focused on -- the court just focused on the

5    amended pleading, that there was no patent issue and no

6    jurisdiction.  And that's in a case where there wasn't --

7    there weren't threats.  There was an actual filing of a

8    patent claim.  And so, you know, here we -- the initial

9    complaint -- we didn't bring a claim for patent

10   infringement.  So, you know, I think, based on Judge Kyle's

11   holding in *Uncommon versus Wiese*, I think the focus should

12   be on the amended complaint.  But I guess my point is, Your

13   Honor, even if we look at that initial complaint, you know,

14   it only says what discovery may reveal.

15           THE COURT:  I think there's a little bit of maybe

16   a blending of two issues or maybe I am not understanding it.

17   The question of whether they can -- they have a basis for

18   seeking declaratory judgment really, that really is governed

19   by whether there's an immediate threat of -- is there a real

20   case or controversy and is it an immediate threat.  I may be

21   wrong, but I think the *Uncommon* case didn't have a dec

22   action, did it?  I don't think it did, because I think what

23   that was dealing with was on the question of remand of a

24   removed case the court is to look to the amended complaint,

25   but we have a slightly different situation here.  We have an

1     amended complaint, but we also have an answer that -- or a

2     third-party answer that says dec action.  And then the

3     question becomes, well, if they have a dec action and it is

4     proper, is that a sufficient grounds for removal.  So it's

5     slightly different.

6         MR. HUTCHINSON:  You are correct, Your Honor.

7     Those are slightly different issues.  I think my point is

8     that, you know, in the *Uncommon versus Wiese* case, you know,

9     you have an instance where somebody has actually brought a

10    patent claim.

11        Again, saying discovery may reveal something does

12    not create a real case or controversy.  I mean, we have --

13    it would significantly change this case to bring in patent

14    and copyright issues that just are not in dispute.  I mean,

15    they have denied infringement, but we have never accused

16    them of infringement, and we are saying we don't have any

17    evidence that you infringed anything.  So, I mean, I guess,

18    Your Honor, that the policy argument is, is that in any case

19    where there's a breach of an NDA or a noncompete case, where

20    there's the potential for infringing of patents and

21    trademarks, I mean, we're not going to say that there's

22    federal jurisdiction over all of those claims.

23        And I think, you know, the *Uroplasty versus

24    Advanced Uroscience* case that we cite in our brief is

25    illustrative of the problem that can be created here.  In

1    that case, the case was before Judge Davis here in this

2    district and it proceeded all the way through summary

3    judgment on these patent issues.  Ultimately, the case goes

4    up to the federal circuit.  The federal circuit says, well,

5    there's no patent case or controversy, so they remand back

6    to the district court with instructions to dismiss for lack

7    of jurisdiction.  That's after the case went all the way

8    through summary judgment in federal court.  So, you know,

9    there's an issue here of unnecessarily multiplying the

10   proceedings here by involving issues and claims that are

11   just not in dispute.

12        And, you know, that *Uroplasty* case stands for the

13   proposition that references to patents and copyrights in a

14   complaint do not give rise to preemption.  In that case

15   there was a former employer who sued a new employer for

16   trade secret misappropriation, kind of similar situations

17   where we have Veritec being the former employer of Badhwa

18   and Shimada, who both of whom now work for Mr. Renner's

19   companies.

20        In *Uroplasty* the plaintiff alleged explicitly in

21   its complaint that the former employer used its trade

22   secrets to prepare and file a patent, and it was reference

23   to a specific patent and specific products that they are

24   alleging were infringing.  And the court held, nonetheless,

25   that that '406 patent that was at issue may be evidence to

1    support a plaintiff's allegations of trade secret

2    misappropriation, but the mere presence of patents do not

3    create a substantial issue of patent law.  And the court

4    went on to explain that plaintiff's claims can be proven

5    without requiring any resolution of patent law.  And that's

6    the same with Veritec's claims here.

7              THE COURT:  Okay.

8              MR. HUTCHINSON:  And, Your Honor, just briefly, I

9    mean, on this argument of artful pleading, my initial

10   comment is if there was any intention by Veritec to try to

11   plead around federal jurisdiction initially, we certainly

12   wouldn't referenced patents and copyrights in the complaint.

13             THE COURT:  Well, that would make an inartful

14   pleading.

15             MR. HUTCHINSON:  Well, it certainly wasn't the

16   intent, but the cases that Mr. Renner relies on all involve

17   instances where you have a plaintiff that is taking patent

18   or trademark claims and just dressing them up in the

19   clothing of state law claims.

20             So, for example, in the Western District of

21   Pennsylvania case of *Husing versus Auction 123*, that case

22   involved competing internet sites that sell cars.  And the

23   plaintiff filed a copyright infringement action in state

24   court.  Defendant removed.  Plaintiff then amends the

25   complaint using the same allegations that the defendant is

1    using its copyrighted photos of cars, but calls it a

2    conversion claim.  That's not what we have here.  You know,

3    I am happy to go through each of our claims and talk about

4    the different proof that we will be using in our claims

5    versus what is at issue in a copyright claim, but none of

6    Veritec's claims involve allegations of copying copyrights

7    or publication of copyrighted material.

8              Another one of the cases --

9              THE COURT:  Let me just stop you for a second.  In

10   your initial complaint -- now, I grant you I am obviously

11   going to ask them if they agree with you about which

12   complaint governs the question of remand, but in your

13   initial complaint you said a couple of things that I think

14   can't quite be so easily dismissed.  So I would like you to

15   address those directly.  Okay?

16             Paragraph 106, Mr. Badhwa utilized Veritec's

17   patented and copyrighted source code to develop similar and

18   competing products.  Now, I can understand that using the

19   patented side of that, that's not necessarily an

20   infringement because it could be a design-around, but use of

21   the copyrighted source code to develop similar and competing

22   products sounds an awful lot like a derivative work.  So

23   let's address that one first.

24             MR. HUTCHINSON:  Right, and it's not.  What we are

25   saying is that Mr. Renner brought in Mr. Shimada who

1     developed the source code.  They didn't -- we are not

2     alleging that they copied that source code, but the

3     architecture of these applications, the know-how of how to

4     put this all together resided in Mr. Shimada's head, and he

5     didn't have to copy the source code.  He didn't have to use

6     that, but he had that, and it's using Mr. Shimada and the

7     architecture of putting this application together.  They

8     never had to show Mr. Renner the source code to do that.

9           And, again, this is almost, you know, that

10    allegation, Your Honor, is almost identical to the

11    allegation in the *Uroplasty* case.  I mean, there, and this

12    is -- I quote the federal circuit, quote, the '406 patent

13    may be evidence in support of plaintiff's allegations.  And

14    there you had, you had -- the allegation was that they had

15    used the patent -- the trade secrets to file this patent.

16          So, you know, it's very similar to the allegation

17    there, but we are not accusing them.  And if Your Honor

18    looks at, you know, to have a claim of copyright

19    infringement, that focuses on the copying or the

20    distribution or the publication of that copyrighted work.

21    We're not saying that they have used or copied, that they

22    published or disseminated or distributed or publicized our

23    source code.  We are not accusing them of infringement, you

24    know, and this isn't a derivative work.  So we're -- we

25    haven't -- even in that initial complaint, we are not

1    alleging that they infringed the copyright.

2            THE COURT:  Paragraph 109 says aPay and aPhone are

3    substantially and illegally derived from...copyrighted

4    source code.  Same answer?

5            MR. HUTCHINSON:  Same answer, Your Honor.  We are

6    not saying that -- and even based on what we know now, which

7    is different than when we filed this initial complaint, I

8    think even at that time we are not accusing them of

9    infringing the patent or the copyright, but the aPhone is,

10   nonetheless, illegally derived from our technology because

11   the people who put that technology to work went and worked

12   for -- and they work for Mr. Renner now, in breach of both

13   our agreements with Mr. Renner and in breach of our

14   agreements with the two individuals, Mr. Badhwa and

15   Mr. Shimada.

16           THE COURT:  Paragraph 140 says -- and again,

17   obviously, I am not quoting.  I am using ellipsis here.  But

18   the aPay and aPhone are based on the misappropriated source

19   code.  So, again, now that seems -- it seems like 106 then

20   109 then 140 get progressively closer, at least, to the

21   allegation that this is copyright infringement.  So what's

22   the response?  Now it is saying that the source code has

23   been misappropriated and the offending technologies are

24   based on that misappropriated source code.

25           MR. HUTCHINSON:  So, again, copyright infringement

1    requires that there be some publication or use of a

2    copyright.

3            THE COURT:  Well, that's the use, right?  They

4    misappropriated the source code to use in their phone.

5            MR. HUTCHINSON:  Well, not to use, no, not to use

6    in their phone, but to understand the architecture of how

7    Veritec products work, so then that we can go create our own

8    competing business that's not -- we are going to be careful

9    not to infringe or use their source code, but now we know

10   how theirs works.  We are going to make a similar product,

11   but -- that is going to be based on the sharing and the

12   disclosure, but that's different than saying that they're

13   actually using it.

14           THE COURT:  Yeah, I understand that difference

15   that you are articulating, but -- and maybe this doesn't

16   matter, but at least as initially drafted one could read

17   that as at least ambiguous as to whether you are alleging an

18   infringement or not.  Would you agree with that?  I mean,

19   now you are saying no, no, they are not using the

20   copyrighted material to derive a second copy and use it in

21   our phone.  You are now saying what they really did is they

22   picked the brain of one person so that they wouldn't have to

23   reconfigure or reinvent how to do the architecture.  I

24   understand that, or I think I understand that distinction.

25   But the original complaint certainly didn't make that

1    distinction, did it?

2          MR. HUTCHINSON:  Well, in the totality, Your

3    Honor, there is no objectively reasonable way to view this

4    complaint as alleging infringement.  There's paragraphs in

5    this complaint that expressly state that discovery may

6    reveal evidence of infringement.  Then there's no actual

7    affirmative allegation of infringement or use, direct use of

8    a copyright.  So, you know, Your Honor, I do not believe

9    that paragraph 140 taken alone says infringement, but

10   certainly, you know, one has to read the entire complaint.

11   And as a complete pleading, the complaint is very clear that

12   there is no allegation in infringement, and there is

13   actually an admission that there isn't any evidence yet of

14   infringement.  And, you know, from what we now know we don't

15   believe that there is infringement.  We don't believe that

16   discovery will yield that.  And we think it will be

17   excessively burdensome on Veritec to turn this breach of

18   contract claim against Mr. Renner into a federal patent

19   dispute.

20         But, again, on the issue of preemption, all of the

21   cases that they cite really involve claims of infringement

22   that are just relabeled as state law claims.  That's true in

23   the *Stelly* case that they cite.  That was -- that case

24   involved the actual use of drawings for tools.

25         In the *Panizza versus Mattel* case, that case

1    involved a plaintiff who settled copyright claims and then

2    later brought a claim for unjust enrichment.  That was based

3    on the same allegations as their previous copyright claim,

4    and that was for the alleged theft of a TV show idea.

5            The *Harper & Row versus Nation Enterprises* case,

6    that was a dispute between two publishers who one accused of

7    publishing the portions of President Ford's memoirs related

8    to Watergate and his pardoning of President Nixon.  So that

9    case bears no resemblance to the claims that Mr. Renner

10   breached his contract and misappropriated Veritec's

11   business.  Again, Veritec does not allege that Mr. Renner

12   published or used any copyrighted materials.

13           So, Your Honor, I think this is a case that

14   belongs in state court.  And there are no patent disputes.

15   There is no copyright disputes.  We have made that clear in

16   the amended complaint.  To the extent there was any

17   confusion, we don't believe there was.  I understand the

18   paragraphs that the court has pointed out, but we would

19   respectfully ask that the court would remand this back to

20   state court.

21           THE COURT:  Okay.  Thank you.

22           Mr. Hansen.

23           MR. HANSEN:  Good afternoon.

24           THE COURT:  Good afternoon.  Quick question for

25   you.  Do you agree with Mr. Hutchinson that for purposes of

1    this question, the remand, the operative complaint is now

2    the amended complaint?  And if you don't agree with that,

3    why not?

4              MR. HANSEN:  Your Honor, I don't agree with that.

5    I believe that the jurisdictional question is done at the

6    time of the original filing or the original remand, so I

7    believe that original complaint.  And the *Jim Arnold* case,

8    which is actually cited by them, stands for that

9    proposition.

10             But I think more importantly here, and Your Honor

11   touched on this earlier today, we have a declaratory

12   judgment claim for noninfringement and invalidity of the

13   patents and the copyrights and that drastically changes

14   things in terms of the federal question here.

15             So as I can tell Your Honor certainly has read all

16   the papers, and I thought that we spelled out the issues

17   quite clearly there, but there are two reasons why we can

18   have federal jurisdiction here.  The first and I think the

19   most straightforward one, which hasn't gone away with

20   anything that counsel now argued or that they have put in

21   writing to us in the past, is they have alleged

22   infringement.  When we asked them to say, well, okay, we

23   withdraw that or we will say you don't infringe, the

24   response was, well, we are not aware of anything.

25             Their original complaint clearly states that

1    discovery may reveal infringement of copyrights or

2    infringement of patents, and under the *3M* case that is

3    enough for declaratory jurisdiction.  But as Your Honor just

4    went through with counsel, those "may infringe" paragraphs

5    aren't even the biggest ones in my mind.  The biggest ones

6    are 106 and 109.  They say that they utilized -- that we

7    utilized patented and copyrighted technology.  Use is

8    infringement under 35 U.S.C. 271(a).  Use is infringement of

9    a copyright under 17 U.S.C. Section 106(1).  And then later

10   in Section 109 -- excuse me -- in paragraph 109 of the

11   original complaint, they say that we substantially derived

12   technology from copyrighted work.  Well, derivative works

13   under 17 U.S.C. 101(2) are the exclusive right of copyright

14   owner.  And so I don't understand how, you know, Veritec can

15   argue that they haven't alleged infringement or that they

16   are not saying that there is infringement when they have a

17   verified complaint out there expressing infringement.

18        And what compounds all of this is, as we include

19   in our materials, we asked for clarity on this point.  Are

20   you saying do we not infringe or are you saying we are not

21   aware of infringement?  And counsel's response has always

22   been, well, we are just not aware of anything right now.

23        THE COURT:  If they had said you don't infringe,

24   would that take care of it then?

25        MR. HANSEN:  If they clearly had a covenant not to

1    sue, which they can unilaterally create, if they clearly say

2    that any product that's currently in existence does not

3    infringe any patent or any copyright that Veritec owns, if

4    they said that, that would divest federal jurisdiction under

5    the declaratory judgment claims.  That would mean there

6    aren't expressly patent or copyright infringement claims.

7    There is still the preemption issue.

8            I see Your Honor has a question.

9            THE COURT:  Yeah, there is still a preemption

10   issue.  But do you hear Mr. Hutchinson's statements today as

11   being different from statements in the past of we're not

12   aware?  It sounded a little bit different to me.

13           MR. HANSEN:  I would agree with you that at times

14   it sounded closer to there is no infringement or that we

15   aren't sure or that we don't believe there is infringement

16   today, but it did seem equivocal, particularly when he

17   returned back to the idea that saying in paragraphs I

18   believe it's 40 -- or 42 and 45 that there may be

19   infringement.  In his -- the way I understood him was that

20   is evidence that we're saying there isn't infringement.  To

21   me that is saying you are suggesting there might be.  And I

22   didn't hear anything that was a direct, clear disavowal of

23   patent and copyright infringement that would satisfy a

24   covenant not to sue that would divest this court of

25   jurisdiction.

1      THE COURT:  Okay.  So let me ask you a different

2  question.  I have read the cases.  Tell me this first.  Am I

3  correct that there is no Eighth Circuit decision applying

4  the express preemption as opposed to the defensive

5  preemption doctrine to copyright and patent actions?  Am I

6  right about that?

7      MR. HANSEN:  I believe that's correct, Your Honor.

8      THE COURT:  Okay.  And then we have the express

9  preemption cases that exist from other circuits applying it

10  to patents and copyrights, but, in essence, for lack of a

11  better way of putting it, we're being asked -- and I say

12  "we," because I have a funny feeling that no matter where I

13  go everybody is going to go up to the 14th floor after

14  this -- we're being asked to figure out what we think either

15  the Eighth Circuit would do or maybe in some way what the

16  Eighth Circuit should do.  Right?

17      MR. HANSEN:  I believe that's right, Your Honor.

18      THE COURT:  Okay.  So why, given -- well, why

19  should we extend that doctrine?  Why should we apply the

20  express preemption doctrine in this context, even assuming

21  the complaint would fall within that rule, if it were

22  applied?

23      MR. HANSEN:  Well, Your Honor, I believe that it's

24  quite simply the better rule.  I think that when there are

25  questions, particularly around intellectual property that is

1     governed by federal statute, the courts and decision makers

2     best equipped to deal with that are the federal judiciary.

3     And that's what Congress has expressly stated when it made

4     patents and copyrights exclusive federal jurisdiction.

5          So when you have state law claims that are simply

6     dressed up or maybe dressed down is the right word, but they

7     are patent or copyright infringement by another name, I

8     think you might have courts that are unfamiliar with those

9     concepts and might -- you know, I certainly have a lot of

10    respect for our state court judges here, but they don't see

11    patent issues every day.  They don't have an understanding,

12    you know, that the federal bench does in terms of the claims

13    govern what is patented.  And, you know, so if you have a

14    breach of contract claim, but the allegation is really, you

15    know, they gave away patented technology, there necessarily

16    has to be an analysis then of the patent claims.  And I

17    think for courts like state courts that aren't used to

18    understanding what is or is not patent infringement or how

19    you go about proving it, you could have some decisions that

20    really don't mesh with what would happen in federal court

21    and that is a disservice, you know, for defendants in those

22    cases.

23          THE COURT:  Okay.  Keep going.

24          MR. HANSEN:  Sure.  As I started, Your Honor,

25    Veritec has refused to issue a covenant not to sue.  And

1    while I do believe that that verified initial complaint

2    creates the declaratory judgment jurisdiction, the amended

3    complaint really doesn't take away any of our concerns.

4           If you look at the red line between the first

5    complaint and the amended complaint, all that's really

6    happened in there is they have removed the words "patent"

7    and "copyright," but it's underlyingly still true that they

8    are alleging that the basis for some of these state law

9    claims are intellectual property or source code.  Instead of

10   saying patents and copyrighted source code, they just say

11   intellectual property or source code.  These are in the

12   amended complaint, which is at the Docket 20, paragraphs 42,

13   45, 47, and now the old 106 is now paragraph 110 and the old

14   109 is now 113.  And it is still alleging intellectual

15   property -- or not infringement, but use of intellectual

16   property in violation of various agreements, and again that

17   use is really patent infringement or copyright infringement.

18          THE COURT:  Go ahead.  Keep going.

19          MR. HANSEN:  I was going to say, you know, counsel

20   touched on the *Uroplasty* case and tried to make an analogy

21   there.  There the underlying action was for trade secret

22   misappropriation, and the allegation there was that the

23   defendant took trade secret information and converted it

24   into a patent.  So there wasn't an allegation that some

25   patent infringement occurred, that they were using patented

1    technology.  It was that they had stolen information and

2    then converted it into a patent.  That's much different than

3    here where they are saying the aPhone and aPay actually

4    utilized patented technology or that it's derived from

5    copyrighted source code.  So I don't think the *Uroplasty*

6    case is really on point.  Neither too is, you know, the

7    *Uncommon case v. Wiese*.  As Your Honor pointed out, there

8    wasn't -- or there wasn't a declaratory judgment action at

9    issue there.

10          Your Honor, I think you understand the cases and

11   certainly the fact pattern here.  The last thing I would

12   close with is, you know, counsel certainly set forth a

13   rendition of their version of the facts.  We obviously very

14   much disagree with them.  They have different products and

15   those kinds of things, but the real issues here are federal

16   questions.  There are federal questions here both under the

17   declaratory judgment context and under preemption, and we

18   would ask that this case remain in state court.

19          THE COURT:  Let me ask you a couple quick

20   follow-ups to that.  If you have a viable or proper

21   declaratory judgment action -- I haven't looked closely at

22   this, but can you really create -- if that's the only thing

23   that would be a federal question, can you really create the

24   jurisdiction by the defendant's pleading?

25          MR. HANSEN:  Yes, Your Honor.  Unfortunately, I

1    don't have that case on total recall, but it is cited in the

2    section of our brief that deals with this.  I think the

3    alternative that I suppose the court could entertain, and I

4    hope it does not decide to do this, is we could have two

5    proceedings.

6              THE COURT:  Right.

7              MR. HANSEN:  We could have a declaratory judgment

8    proceeding here in federal court while there is a state

9    court related proceeding.

10             THE COURT:  Right.  Okay.  All right.  The last

11   thing.  Do you agree with Mr. Hutchinson, setting aside the

12   declaratory judgment jurisdiction -- it looks to me like the

13   allegations certainly in the amended complaint are more

14   precisely pleaded in the sense of, for example, the new --

15   the new 109 says Mr. Renner used confidential and trade

16   secret knowledge possessed by Mr. Shimada, in addition to

17   the confidential and other trade secret information held by

18   Mr. Badhwa in the development process.  That doesn't

19   necessarily implicate patents or copyrights, correct?

20             MR. HANSEN:  I believe that on its face that is

21   correct, but you have to look at this with the lens of what

22   hasn't been disavowed or what the original complaint was and

23   those terms certainly before included copyright and patented

24   technology.

25             The other thing I will say here is while

1    certainly, you know, there's the *Iqbal/Twombly* standard of

2    pleading here in federal court, you know, the complaints

3    themselves are still general averments.  And when I look at

4    the new paragraph 109, which is now 113, it says trade

5    secret and confidential information, which, again, we know

6    they think is covered by patents and copyrights, but it also

7    says and technology developed by Veritec.  And when I think

8    about that, I think about discovery requests that we're

9    going to get and I think about all the different ways in

10   which they are going to try to allege, you know, or prove up

11   their case or find facts to prove their case and I think

12   that those will include questions about patents and

13   copyrights.

14        THE COURT:  Well, and I think obviously they

15   wouldn't disagree with that.  They are saying pretty clearly

16   right now that what was developed by Mr. Renner, it was a

17   violation of the -- Mr. Hutchinson said noncompete.

18   Certainly, the confidentiality agreement is their

19   allegation.  It was a user patient of a business

20   opportunity.  All of that are recognized state law claims,

21   wouldn't necessarily depend upon a use of copyrighted

22   material or an infringement of patented technology.  All of

23   that would seem to be true.

24        So let's say I agree with them and the case is,

25   and Judge Schiltz agrees with me, and the case is remanded

1    to state court.  We're a year down the road and, you know,

2    you're at summary judgment or whatever and you say this is

3    the scope of their claim and now all of a sudden they say,

4    well, it probably violated copyrights and patents too.  In

5    that procedural posture, can it be removed at that time or

6    does the time period simply cut you off?  Do you follow what

7    I am saying?

8              MR. HANSEN:  I do follow what you are saying.

9    And, Your Honor, I have not thought much about that

10   particular jurisdictional question.

11             THE COURT:  Neither have I.

12             MR. HANSEN:  And I don't want to guess on

13   something like that.

14             One of the points I will make here, though, is,

15   again, they have said their trade secret information is part

16   of the misappropriation, but they also, I believe, have

17   alleged that that same trade secret information is patented

18   and copyrighted.  That in and of itself would be a defense

19   to trade secret misappropriation, is that this is in fact

20   covered by their patents.  So that's another way in which

21   the patent laws are going to have to be used to evaluate

22   their trade secret claim in light of their pleading.

23             And I think under *Gunn v. Minton*, the U.S. Supreme

24   Court case that Veritec has cited, you know, there that was

25   about an attorney committing malpractice; but here when you

1    talk about whether there is a substantial federal question

2    or not, there really is an important federal issue in terms

3    of what is trade secrets and what is patented, especially

4    now that, you know, we have an expanded defendant trade

5    secret acts case.  I think that it will be important for the

6    federal courts to start addressing issues of overlap in

7    these trade secret or patent cases.  And, again, I think

8    it's best for a federal court to decide whether in fact this

9    patent does cover trade secret technology and therefore

10   because a patent is public there is no trade secret.  So I

11   don't think merely pleading out patent or copyright issues

12   makes these preemption questions go away.

13           THE COURT:  Well, in that last hypothetical, if

14   the claim -- you are standing at trial in Hennepin County

15   District Court and the claim is they misappropriated trade

16   secrets and you hold up a patent and say it's right there

17   either in the claims or it's right there in the body of the

18   patent, isn't that just a straightforward defense to trade

19   secret?  It can't be secret; it's right here.  And it

20   doesn't -- doesn't require an elaborate knowledge or

21   application of patent law.

22           MR. HANSEN:  I think that that might be the case

23   in some technologies, for example, if you had a fishing lure

24   or something along those lines.  It's really not hard to see

25   whether the specification has enabled the patent or not.

1              In these cases of computer source code and

2      higher-end technologies like this, you are going to have

3      questions about enablement and what the patent teaches and

4      doesn't teach.  And, again, I think that the federal bench

5      has more experience with advising on and creating jury

6      instructions for what a patent has enabled or has not

7      enabled and therefore disclosed to the public.

8              THE COURT:  Thank you.  I blanked on the word

9      specification.  I was actually asking a slightly different

10     question.

11             MR. HANSEN:  Sorry, Your Honor.

12             THE COURT:  No.  It wasn't clear.

13             So let me give you a real-life example, okay, one

14     that I am familiar with.  He's suing you because you stole

15     their slot cell technology.  And slot cell technology is

16     essentially how to mold a big plastic taco.  Right?  And

17     they say that's a trade secret because we use various

18     machines and therefore you are in violation.  And you on

19     cross-examination of their expert hold up ten different

20     patents, and in the specification it is talking in there

21     about using, you know, slot cell technology, molding this

22     same plastic using various pieces of machinery.  And so it's

23     not a question of does that enable the patent that you are

24     using.  It's a it was disclosed in the public; therefore,

25     it's not a trade secret.  That would be a defense to trade

1     secret that would clearly involve some aspects of patent,

2     but not really invoke federal jurisdiction, right?

3              MR. HANSEN:  I think I follow you, Your Honor.

4     And I certainly appreciate where you have gone there.

5              THE COURT:  All right.

6              MR. HANSEN:  I think, though, that there is

7     still -- certainly, you could cross-examine in the way you

8     suggest; and if that expert was up there and said, yeah, the

9     patent says exactly that, you know, that would be the line

10    of questioning and it's really not about whether the claims

11    are enabled.  So I agree with you on that point.  I guess --

12             THE COURT:  It would be like *Uroplasty*?

13             MR. HANSEN:  Yes.

14             THE COURT:  Okay.

15             MR. HANSEN:  But I think in terms of what the

16    claim scope is and even in marshaling, you know, standards

17    on, you know, *Daubert*-related motions in patent context,

18    while the concepts are very much the same, there are a lot

19    of nuances to patent law and what is or is not admissible

20    testimony.  And, again, there is a lot -- there is a lot of

21    case law on what is enablement and those kinds of things;

22    and I think that if something is enabled, certainly it can

23    no longer be a trade secret.

24             THE COURT:  Okay.  Thank you.  Anything further?

25             MR. HANSEN:  No, Your Honor.

1              THE COURT:  Okay.  Before you stand up,

2      Mr. Hutchinson, Mr. Cassioppi.

3              MR. CASSIOPPI:  Nothing from me, Your Honor, other

4      than to echo counsel's comments that we vehemently disagree

5      with the factual recitation that was at the beginning of

6      counsel's statements, but we will save that for a later

7      date.

8              THE COURT:  From your perspective, you don't care

9      which court you are in?  You just want to be in court?

10             MR. CASSIOPPI:  Yeah.  Well, we brought a $100,000

11     breach of promissory note claim.  I noted the irony of

12     counsel's statement that it would be burdensome to have this

13     breach of contract action, purported breach of contract

14     action in federal court, when we brought a $100,000

15     promissory note claim and we are now in World War III, but

16     it is what it is.

17             Thank you, Your Honor.

18             THE COURT:  Okay.  Thank you.

19             Go ahead, Mr. Hutchinson.

20             MR. HUTCHINSON:  Well, I was a little surprised to

21     hear that there is still confusion over, you know, whether

22     we are asserting infringement claims.  We are not.  At issue

23     in this case is Mr. Renner's two products that they have

24     brought to market.  It's the aPhone and the aPay products.

25     Veritec doesn't have any patents related to the phone or the

1    payment process.  There's also no copyright for the source

2    code for the mobile payment application.

3              Veritec does have patents, Your Honor, but those

4    are on QC barcode technology, so, you know, the black and

5    white squares.  Right now to our knowledge Mr. Renner hasn't

6    entered that market or -- and is not infringing on those

7    patents.

8              But their dec j claims seek to encompass all kinds

9    of patents that have nothing to do with this case.  So

10   that's the concern with giving -- a covenant to sue is about

11   the future, and we don't want Mr. Renner with the assistance

12   of Mr. Shimada and Mr. Badhwa in the future to infringe on

13   that barcode technology and patent.

14             So with respect to the aPhone and the aPay, there

15   are no allegations of infringement.

16             THE COURT:  Nor could there be, according to you.

17             MR. HUTCHINSON:  Nor could there be.  So there's

18   no basis for any declaratory judgment based on the products

19   at issue.  So there has to be a specific tie to the products

20   at issue and the patents, you know.  And that was the issue

21   in *3M versus Avery Dennison*.  There were specific patents

22   that they were saying -- that there was a direct link

23   between the products and the patents.  We don't have that

24   here.  We would give a covenant not to sue based on the

25   aPhone and the aPay not infringing any copyrights or

1    patents.

2         THE COURT:  Understood.  Thank you.  That's very

3    clear.

4         MR. HUTCHINSON:  And also your question, Your

5    Honor, about, well, what would happen in the future.  What

6    if they did come out with a barcode that did infringe on

7    Veritec's patent for barcodes?  Well -- and we are back in

8    state court where we should be?  At that point if we added a

9    new claim, they would have an opportunity to remove that new

10   claim.  And, obviously, we wouldn't be able to amend in

11   state court unless there was a showing of good cause that

12   didn't prejudice them.  The state court would apply the

13   same, you know, the pleading requirements there, but they

14   would have an opportunity to remove that, if we could even

15   add it, but there's nothing here that suggests that at this

16   point.

17        THE COURT:  Well, and, frankly, the thing that

18   neither of you have really discussed, and this helps you,

19   but I take issue with your statement, because one of the

20   issues or one of the questions is even if you were allowed

21   to bring that claim and plead it in state court, if you were

22   allowed to amend your complaint, the question that is still

23   open is, even if I baldly did that, do they have a right to

24   remove or is this simply defensive preemption?  They have

25   the right to have that claim dismissed?  Right?

1      MR. HUTCHINSON:  I believe they would, Your Honor.

2      THE COURT:  Oh, they would clearly have the right

3   to have that dismissed.

4      MR. HUTCHINSON:  Right.

5      THE COURT:  I don't think it's -- I mean, it isn't

6   decided as a matter of Eighth Circuit law whether or not

7   they would have a right to have that removed, right?

8      MR. HUTCHINSON:  That's correct.

9      THE COURT:  Well, that's not exactly correct.

10  They would have a right to have -- that claim gets in

11  federal court, but the question is whether the rest of it

12  carries at that point.

13     MR. HUTCHINSON:  Right.

14     THE COURT:  Okay.  But one last question, now that

15  you have raised the aPhone, aPay.  They're in the posture of

16  a third-party defendant.  So they are raising a

17  counterclaim, right?  And that counterclaim for declaratory

18  judgment doesn't have to be related to the same technology,

19  does it?

20     MR. HUTCHINSON:  Yes, it does.  They can't bring a

21  counterclaim based on allegations that are not in our

22  complaint, and the counterclaim has to relate to --

23     THE COURT:  Well, cross claim maybe I should be

24  saying?  No, not a cross claim either?

25     MR. HUTCHINSON:  Oh, I think it would be a

1  counterclaim.

2          THE COURT:  Okay.

3          MR. HUTCHINSON:  But that has to still relate to

4  the issues in dispute.  I mean, they can't inject entirely

5  new issues into this case, and they certainly can't do it on

6  a dec j.  But, you know, procedurally, Your Honor, there is

7  no operative answer in counterclaims on the docket.  So we

8  filed our amended complaint, and they will have -- I don't

9  have the time in front of me, but they have some amount of

10  time to respond to that pleading.  We're not currently

11  dealing with a docketed answer and counterclaims.

12          But to the issue then, I mean, we would have the

13  same issue as to whether there's, you know, Article III

14  standing, I mean, whether there's an actual case or

15  controversy over patents for barcodes, wherein there's no --

16  this case has nothing to do with barcodes.  So when we try

17  to match up the patents that are at issue in their dec,

18  their dec j claims, there's no dispute.  We have not even

19  had any conversation with them.  There's no reference to any

20  of that in our initial complaint or in our amended

21  complaint.

22          THE COURT:  Okay.  Thank you, Mr. Hutchinson.

23          Go ahead.

24          MR. HANSEN:  Your Honor, I'll be brief.  The

25  counterclaims certainly could include anything.  They just

1    wouldn't be a compulsory counterclaim.  It would be a

2    permissive counterclaim.

3            THE COURT:  All right.  That's what I am looking

4    at.  That's why I wanted to know that.

5            MR. HANSEN:  But I think the other idea is, you

6    know, Veritec's suggestion that some of these patents are

7    coming out of left field, they are not.  It's paragraph 45

8    of the verified complaint.  Those are the patents that we're

9    issuing the dec action on.  So those are the patents that

10   they put in their verified complaint and then later said we

11   utilized as part of this technology.  So it's not like we

12   are making things up out of whole cloth here.  It came from

13   their complaint.

14           Thank you, Your Honor.

15           THE COURT:  Thank you.

16           I'll give you the last word if you need it,

17   Mr. Hutchinson.

18           MR. HUTCHINSON:  Nothing further, Your Honor.

19           THE COURT:  Okay.  All right.  Thank you.

20           I'll just tell you in advance it's going to take a

21   while to get this order out.  I think this is a very, for me

22   at least, it's a very complicated issue and I want to get it

23   right, so it will be a while.  All right?

24           Thank you, everyone.  Court's in recess.

25           THE CLERK:  All rise.

1              (Court adjourned at 4:11 p.m., 09-10-2018.)

2                           *   *   *

3         I, Renee A. Rogge, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6                      Certified by:  /s/Renee A. Rogge_____
                                      Renee A. Rogge, RMR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25